[No. B128062. Second Dist., Div. Three. Apr. 2, 1999.]

ARMANDO D., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Real Party in Interest.

**COUNSEL**

James E. McNamara and Lawrence E. Fluharty for Petitioner.

No appearance for Respondent.

Lloyd W. Pellman, County Counsel; Auxiliary Legal Services, Judith A. German, Patrick D. Goodman and Arezoo Pichvai for Real Party in Interest.

**OPINION**

**KLEIN, P. J.**—Petitioner Armando D. (father) seeks writ review (Welf. & Inst. Code, § 366.26, subd. (*l*); Cal. Rules of Court, rule 39.1B)[1] of respondent court's order terminating family reunification services and setting a hearing under section 366.26 as to Nicole S. (born Apr. 24, 1998). We deny the writ.

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The family history prior to the birth of Nicole.*

This case commenced with the filing of a petition under section 300 in Orange County with respect to Nicole's siblings, David S. (born Jan. 29, 1993) and Ashley S. (born Apr. 30, 1997). Case records indicate David and Ashley S. were born drug exposed to cocaine and methamphetamine, respectively; mother has a long history of substance abuse, domestic violence and criminal activities commencing in 1988; and father has a history of domestic violence and drug and alcohol abuse. The juvenile court in Orange County sustained a section 300 petition as to David and Ashley on July 21, 1997, and transferred the matter to Los Angeles County for disposition.

The County of Los Angeles commenced supervision of the case on August 25, 1997. The children's social worker (CSW) assigned to the case indicated mother had enrolled in two drug treatment programs between April and August of 1997 but failed to complete either and tested positive for drugs in July of 1997. The mother (mother) was arrested for shoplifting on August 26, 1997, and convicted in September of 1997 of commercial burglary. Mother anticipated release from jail in February of 1998. Father told a dependency investigator that he lived in his brother's tire shop. Father said he would move to an apartment and take parenting classes when the minors were returned to him because he did not wish to waste time if the children were not going to be returned. David S. was placed with the maternal grandparents; Ashley S. was placed in the foster care of Beth R. through the Westside Children's Center foster family agency (WCC).

On November 7, 1997, the Los Angeles County Department of Children and Family Services (DCFS) filed a supplemental petition under section 342 which the juvenile court sustained on December 27, 1997. As amended, the sustained petition alleged mother and father have a history of domestic violence, and mother is incarcerated and unable to provide for the minors. The juvenile court ordered father to participate in parenting class and individual counseling to address domestic violence. The juvenile court also ordered father to submit eight random drug tests and, if any of the test results were positive, to complete a program of drug counseling and testing.

2. *Detention and reunification efforts as to Nicole.*

On April 24, 1998, mother gave birth to Nicole and DCFS filed a section 300 petition four days later. The application for petition indicated mother had entered a CLARE Foundation sober living facility in West Los Angeles

after her release from jail in February of 1998, had enrolled in an outpatient drug treatment program and had attended regularly for one month before giving birth to Nicole. However, the mental health nurse at the Santa Ana jail, the CSW, the social worker at WCC, nurses at the drug treatment program, and the hospital social worker who attended Nicole's' birth "all observed that mother exhibits signs of grandiose thinking, rapid, pressured speech, and inability to focus . . . . [Mother's] mood alternates between anger and hostility to acceptance and friendly attitude often, and regarding the same issue or person." Mother reported father visited Nicole after her birth but "did not call or visit again." While mother was incarcerated, father showed little interest in David and did not visit Ashley. Father claimed he was clean and sober, he had commenced counseling and wanted his children back, but DCFS reported father continued to reside in the tire shop and "his circumstances are barely adequate for his own welfare."

A report prepared for June 17, 1998, indicated Nicole had been placed with Ashley in the foster care of Beth R. through WCC. Mother had returned to CLARE Foundation where she remained drug free but "presented as anxious, fragmented, with labile mood and some obsessional thinking, . . ." After several conflicts with residents and a major rule violation, mother was asked to leave and, on June 3, 1998, she entered a residential drug treatment program called His Sheltering Arms. Father had provided eight consecutive drug screens, completed a parenting class, and regularly was attending individual counseling at La Familia where he had shown willingness to maintain a sober lifestyle. Father's "renewed interest in his children" had "coincided with mother's release from incarceration." The WCC social worker, Cynthia Stogel, M.A., M.F.C.C., reported mother complained "often and loudly" about Ashley's care but that father "takes a passive role, usually confined to quiet support of mother's position." Ashley "recognizes both parents as people she has regular contact with." Father had visited David infrequently and had not asked for more visits. Ashley and Nicole reportedly were making "excellent progress" in Beth R.'s foster care.

On June 17, 1998, the juvenile court declared Nicole a dependent child of the court pursuant to section 300 based on sustained allegations that mother has a long history of drug abuse which renders mother incapable of providing adequate care and supervision, and that Nicole's siblings, David and Ashley S., are currently dependent children due to mother's drug abuse and failure to provide. The juvenile court continued the matter for an 18-month review hearing as to David and Ashley and a 6-month review hearing as to Nicole.

A report prepared for July 30, 1998, indicated mother had been discharged from His Sheltering Arms on July 21, 1998, for not following rules and

engaging "in angry outbursts and verbally assaultive behaviors." Father continued to maintain a relationship with mother and told the CSW that mother is an excellent caretaker of the minors and "their plan is for mother to take custody of David, for father to take custody of the girls, then for them to reunite and be a family."

On July 30, 1998, the juvenile court granted Beth R.'s a request for de facto parent status as to Ashley, and ordered a psychological evaluation of mother and father.

A report prepared for November 3, 1998, indicated mother had enrolled in Patterns, a residential drug rehabilitation program, after her discharge from His Sheltering Arms. Mother's counselor at Patterns indicated mother "showed no insight and minimal desire to take responsibility for [her] past actions." Because of mother's agitated behavior and inability to concentrate, she was referred for a psychiatric evaluation and diagnosed by a staff psychiatrist as suffering attention deficit disorder. Mother was prescribed medication but "continued to struggle with anger management and impulse control problems," and was asked to leave Patterns. Although mother was given many referrals, she refused to consider any new residential program and was discharged from Patterns on October 16, 1998. Mother moved into the tire shop with father, told the CSW they were looking for a house or apartment, and requested a 60-day visit with all minors. However, the CSW had advised mother, three days earlier, that a 60-day visit would be inappropriate because mother had not complied with court orders, continued to show great instability in behavior, and lacked "insight, remorse or concern about having been discharged from three rehabilitation programs." The report noted father's counselor, Nieves Vigil, had discussed with father the need to obtain appropriate housing and child care before the minors could be returned to him "every time he comes [for] counseling."

Stogel reported that "both parents are unstable, individually and as a couple." "Neither parent demonstrates an understanding of child development or age-appropriate behavior." Stogel noted the interaction between mother and father had not changed over 18 months of observation. David's visits with father "were not particularly gratifying for David." Father usually brought Armando, Jr., one of father's two older children, with him and spoke to Armando in Spanish leaving David feeling "shut out. Maternal grandmother reports that when the visits end, both David and father just walk away from each other, without a hug, a kiss or discussions of future visits. Maternal grandmother also reports that father does not call David between visits."

David Jimenez, Ed.D., evaluated mother and concluded she presented a moderate risk to the minors. "She has extremely poor impulse control, poor

insight into her behavior, and difficulty with personal boundaries." Mother's profile on the MMPI-2 (Minnesota Multiphasic Personality Inventory) indicated a probable diagnosis of paranoid schizophrenia and such a "profile has also been associated with diagnosis of antisocial, narcissistic and borderline personality disorders. She would be prone to extreme loss of impulse control, history of family discord and estrangement, repetitive troubles with authority figures, distrust, projections, and a shallow appreciation of the feelings of others." Jimenez indicated father presented a low risk to the minors. Father's profile was most commonly "associated with hypomania and schizo-manic episodes. A secondary diagnosis may reflect chronic abuse of alcohol, or drugs. His internal conflict would revolve around self-identity. He could be seen as hostile, demanding, indecisive, and destructible. He could develop paranoid projections with a breakdown of reality testing when under stress, . . ." Jimenez indicated mother and father might be reunified with David, but that Ashley's primary bond was with her foster mother. John Leonard, M.D., suggested medication to control mother's disorder.

The CSW wrote, "The evaluations of both experts correspond in that they find mother's behavior chaotic and her adjustment problems intractable." "In Dr. Jimenez's opinion, as long as father is allied with mother, the safety and stability of minors would be jeopardized, . . ." Father told the CSW, "I'm still living in the tire shop. I still have [a] problem with the IRS, and I'm paying an attorney. I have a lot of pressure in my life." Father's counselor reported father needed to stabilize his life and separate from mother.

On November 3, 1998, the juvenile court granted Beth R.'s motion for de facto parent status as to Nicole and continued the matter to November 12, 1998, for a contested hearing. In a report filed on November 12, 1998, the CSW reported father and mother had moved into an apartment together in Garden Grove.

3. *The contested review hearing.*

After receiving various exhibits into evidence, the juvenile court heard the testimony of mother, WCC social worker Stogel, the CSW and father. Mother testified she currently resided with father in their apartment but that she was willing to move if the juvenile court requested it.

Stogel testified she has been assigned to this case since Ashley was placed in the home of Beth R. in September of 1997. Stogel has monitored almost every visit between mother and father and the minors Ashley and Nicole. Stogel testified father missed approximately one month of visitation due to a trip to Mexico and car trouble, he failed to visit Ashley or Nicole in the two

weeks preceding the contested hearing, and he has not demonstrated age appropriate parenting skills. On one occasion, father physically tossed Ashley to mother over an eight-foot dividing wall in the monitored visit room even after Stogel had asked father to stop. Visitation for mother and father has not progressed beyond monitored visitation. Father fails to take initiative with the minors, especially when mother is present, fails to set limits with Ashley and David, and thinks the minors are hungry whenever they cry. During visits when David is present, "David has been karate chopping stuffed animals, jumping all over the place, running around. And [father] participates with David at the same activity level." Father lacked appreciation of Ashley's "sense of boundaries and personal space." Stogel testified father needed "to demonstrate the ability to make decisions regarding parenting . . . on his own, without the input of other people." Stogel testified she did not believe the minors would be safe with mother and father without a monitor present. Stogel had never observed father take any action to correct the inappropriate behavior of mother or David during visitation. Father deferred to mother in "all decisions with regard to both children. And, regardless of whether her decision was appropriate or not, he would not intervene." Stogel had seen no improvement in father's parenting skills from February of 1998, when father first started to visit Nicole, to the present. Stogel testified Ashley and Nicole are bonded to their foster mother, Beth R., and, in Stogel's opinion, it would be detrimental to either minor to be removed from Beth R.'s home or to begin overnight visitation with father.

CSW Eva Rezzato testified Ashley and Nicole recognize father as someone they play with once a week. If either child were separated from Beth R., Rezzato "would have grave concerns that this would have lasting emotional trauma on the [minors'] development." Rezzato testified that, in the 18 months of family reunification services that had been provided mother and father, there had been no "substantial changes in either parents' circumstances, behavior, attitude. And for that reason, I see no possibility of any substantial change beyond this point." Rezzato stated neither parent had benefited from the instruction they had received. Although father's counselor, Nieves Vigil, had discussed with father the need for father to secure housing for himself, and father told Vigil his relationship with mother "was over, that he wanted to put the children ahead of the relationship," two weeks later the CSW found mother and father living together in an "apartment . . . rented in both their names, and both of them stated they wanted to get the children together as a family, as a pair. [¶] That's a clear indication to me that [father] has not resolved his emotional issues surrounding this problem."

Father testified he would comply with an order that mother not reside in the apartment and indicated his sister had agreed to provide daycare for the

minors while father was at work. Father admitted he had two other children besides the three minors involved in this case and that he currently has a relationship with only one of these minors. Father stated that although mother "takes good care of" the minors, he would ensure that mother's visits were monitored if the juvenile court ordered it.

The parties stipulated Nieves Vigil, father's counselor at La Familia, would testify father needs to continue in the recovery process but that he has made "a big transition in his lifestyle." Father attends group meetings, 12-step meetings and individual counseling "more than he is required to attend."

### 4. The juvenile court's pronouncement of judgment.

The juvenile court terminated mother's family reunification services as to Nicole under section 366.21, subdivision (e), based on mother's multiple failures in substance abuse treatment, poor impulse control, and lack of insight.[2] The juvenile court found father regularly had complied with the case plan but that there was no "substantial probability that the minor will be returned to the father's care by the 18-month date, which is . . . approximately ten months away. [¶] The court bases its prognosis on the lack of progress that the father has shown towards becoming a parent to all of his dependent children over the last 18 months, and his apparent lack of desire to become a full-time parent on his own." The juvenile court stated, "father has never raised a child of his own. He has a total of five children, none of which has been in his full-time care." The juvenile court noted father was not in contact with his oldest son, saw 13-year-old Armando, Jr., only when the minor contacted father, father makes no effort to telephone David between visits, and he only began to visit Ashley after mother had been released from jail.

The juvenile court found "father is not equipped to, and has no desire to raise a very young child on his own. After months of encouragement by his own therapist at La Familia to get his own apartment, father obtained an apartment with the mother. [¶] Although he even acknowledged in counseling that he needs to establish his independence from the mother, to this day, he has failed to do so. Father is unable to see the danger that mother poses to these children, and sees no deficiencies in her ability to parent their children. [¶] Father's passivity with respect to the mother prevents him from

---

[2]Section 366.21, subdivision (e), permits a juvenile court to set a hearing under section 366.26 for a minor under the age of three years at the time of detention if, inter alia, there is clear and convincing evidence the parent has failed to participate regularly in court-ordered treatment, and there is no substantial probability the minor may be returned to the parent within six months.

protecting the children from the mother, and prevents him from taking the initiative to parent his children." The juvenile court noted father "has shown no growth with respect to his ability to parent." The juvenile court concluded it was limited by section 361.5, subdivision (a)(2), to a maximum of six months of family reunification services as to Nicole because "there is no substantial probability that the minor will be returned to the father by the 18-month date." The juvenile court indicated Nicole needed the stability of the only home she had ever known and father probably "will continue his relationship with the mother. He fails to realize her shortcomings as a parent, and hence does not strive to become a good parent on his own."

### CONTENTIONS

Father contends the juvenile court lacked authority to terminate father's family reunification services as to Nicole after six months, there was no substantial evidence Nicole could not be returned to father by the 18-month date, and the juvenile court erred in setting a hearing under section 366.26 because it failed to find by clear and convincing evidence that DCFS had offered father reasonable family reunification services.

### DISCUSSION

1. *No reversible error appears in the order terminating father's family reunification services.*

a. *Father's contention.*

 Father contends section 366.21, subdivision (e), permits a juvenile court to schedule a hearing under section 366.26 after six months of family reunification services *only if the juvenile court finds by clear and convincing evidence the parent failed to participate regularly in the case plan. (Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606 [71 Cal.Rptr.2d 668].) Even then, family reunification services may be extended if reasonable services were not provided or there is a substantial probability the minor will be returned within six months. Father claims the juvenile court's finding that father regularly had complied with the case plan renders section 366.21, subdivision (e), inapplicable and thus, the juvenile court lacked statutory authority to schedule a hearing under hearing under section 366.26.

b. *Relevant provisions.*

At the time of the juvenile court's ruling in this case, former section 366.21, subdivision (e), provided in pertinent part: "If the minor was under

the age of three years on the date of the initial removal and the court finds by clear and convincing evidence that the parent failed to participate regularly in any court-ordered treatment plan, the court may schedule a hearing pursuant to section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the minor, who was under the age of three years on the date of the initial removal, may be returned to his or her parent . . . within six months or that reasonable services have not been provided, the court shall continue the case. [¶] . . . [¶] In all other cases, the court shall direct that any reunification services previously ordered shall continue to be offered to the parent or guardian pursuant to the time periods set forth in subdivision (a) of section 361.5, provided that the court may modify the terms and conditions of those services. If the minor is not returned to his or her parent or guardian, the court shall determine whether reasonable services have been provided or offered to the parent or guardian . . . . The court shall order that those services be initiated, continued or terminated."

Former section 361.5, subdivision (a), provided: "Child welfare services, when provided, shall be provided as follows: [¶] . . . [¶] (2) For a minor who, on the date of initial removal from the physical custody of his or her parent or guardian, was under the age of three years, court-ordered services shall not exceed a period of six months. [¶] However, court-ordered services may be extended up to a maximum time period not to exceed 18 months if it can be shown that the objectives of the service plan can be achieved within the extended time period. *The court shall extend the time period only if it finds that there is a substantial probability that the minor will be returned to the physical custody of his or her parent or guardian with the extended time period . . . ."* (Italics added.)

c. *The juvenile court's analysis of the issue.*

The juvenile court indicated concern that section 366.21, subdivision (e), did not permit the setting of a hearing under section 366.26 because father regularly had complied with the case plan. The juvenile court found that section 361.5, subdivision (a)(2), nonetheless precluded an extension of family reunification services because there was no substantial probability Nicole would be returned to father within 18 months. The juvenile court indicated it was presented with a situation in which it was required to terminate family reunification services but lacked express authority to set a hearing under section 366.26. The juvenile court reasoned the only other option, continuing the case for a 12-month review, "would be a useless act" and concluded the legislature intended, but failed to provide, "that under these circumstances, a [section 366].26 hearing may be set." The juvenile court found support for this conclusion in the provisions of section 361.5,

subdivision (b)(10), which permits a juvenile court to deny family reunification services to a parent who has failed to reunify with a minor's sibling. The juvenile court stated, "if Nicole's case were at a disposition hearing today instead of a six-month review hearing, the court, under section 361.5, [subdivision] (b)(10), would have no hesitation in setting the matter for a [section 366.26] hearing."[3]

### d. *No reversible error appears in the juvenile court's ruling.*

Father failed to reunify with David and Ashley after 18 months of family reunification services. None of the social workers involved in this case had seen any improvement in father's parenting skills. Father's contact with the minors had not progressed beyond monitored visitation. Father failed to appreciate the danger mother presented to the minors and perceived mother as an adequate caretaker. Although father admitted to his counselor the need to separate from mother, father thereafter rented an apartment with mother and expressed a desire to reunite as a family with mother. Stogel testified the minors would not be safe in the care of the parents without a monitor present and that it would be detrimental to Nicole to begin overnight visitation with father. Rezzato saw "no possibility for any substantial change" in father's behavior or attitude toward the case.

Based on these circumstances, the juvenile court properly could conclude that Nicole would not be reunified with father by the 18-month review date, which was 10 months distant at the time of the juvenile court's ruling. The juvenile court reasoned that, because the case objectives could not be achieved by the 18-month date, section 361.5, subdivision (a)(2), required termination of family reunification services. The juvenile court *inferred* that the right to terminate family reunification services necessarily included the right to set a hearing under section 366.26 in order to allow the case to progress to implementation of a case plan.

We find no reversible error in the juvenile court's ruling and conclude that where, as here, a juvenile court finds the objectives of the service plan cannot be achieved within the statutory limitation of eighteen months, it may set a hearing under section 366.26 for a minor under the age of three years on the date of detention, after six months of family reunification services. Although section 361.21, subdivision (e), does not authorize an order setting a hearing under section 366.26 in these circumstances, " '[o]ne section of the dependency law may not be considered in a vacuum. It must

---

[3]Under section 361.5, subdivision (b)(10), reunification services need not be provided to a parent who has failed to reunify with a minor's sibling. (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 468 [78 Cal.Rptr.2d 110].)

be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 703-704 [71 Cal.Rptr.2d 780].)

 Here, in addition to the juvenile court's finding that father would not reunite with Nicole by the 18-month date, the juvenile court indicated it would have denied family reunification services to father under section 361.5, subdivision (b)(10), had father's case been at the disposition stage rather than the 6-month review, based on father's failure to reunify with David and Ashley. Consideration of all the relevant factors in this case leads inexorably to the conclusion " 'parental unfitness is so well established that there is no longer "reason to believe that positive, nurturing parent-child relationships exist" [citation], and the *parens patriae* interest of the state favoring preservation rather than severance of natural familial bonds has been extinguished.' [Citations.]" (*Daria D. v. Superior Court, supra,* 61 Cal.App.4th at p. 613.)

Father claims the juvenile court's interpretation of the relevant statutes deprives another provision of section 366.21, subdivision (e), of meaning. The concluding sentences of former section 366.21, subdivision (e), as they existed at the time of the juvenile court's order stated: "In all other cases, the court shall direct that any reunification services previously ordered shall continue to be offered to the parent or guardian pursuant to the time periods set forth in subdivision (a) of section 361.5, provided that the court may modify the terms and conditions of those services. If the minor is not returned to his or her parent or guardian, the court shall determine whether reasonable services have been provided or offered to the parent or guardian . . . . The court shall order that those services be initiated, continued or terminated."

These provisions merely direct the juvenile court to continue to offer family reunification services for the time periods stated in section 361.5, subdivision (a). Because the juvenile court found the provisions of section 361.5, subdivision (a), warranted termination of family reunification services, the juvenile court's order did not deprive the provision cited by father of meaning.

Father's reliance on *Daria D. v. Superior Court, supra,* 61 Cal.App.4th 606, also is misplaced. *Daria D.* addressed the constitutionality of sections 361.5, subdivision (a)(2), and 366.21, subdivision (e), and concluded these provisions are reasonable and bear a substantial relation to the legitimate objectives of dependency law. In the course of its discussion, *Daria D.* noted a juvenile court "may not schedule a section 366.26 selection and implementation hearing at the six-month stage unless it finds by clear and convincing

evidence the parents failed to regularly participate in reunification services." (61 Cal.App.4th at p. 613.) As noted above, we conclude a juvenile court may also set such a hearing, notwithstanding a parent's compliance with court-ordered treatment, if it concludes there is no substantial probability the minor may be returned within the 18-month service plan. Because the parents in *Daria D.* failed regularly to comply with court-ordered treatment, *Daria D.* had no occasion to address what other circumstances might warrant an order setting a hearing under section 366.26, and, thus, it is inapplicable here.

### 2. *The evidence supports the juvenile court's finding the minor would not be returned to father by the 18-month date.*

█ Father contends there was no substantial evidence Nicole could not be returned to him by the 18-month date. Father asserts the juvenile court erroneously considered evidence regarding father's relationship with father's two oldest children which was contained in an Orange County disposition report dated June 3, 1997, which was not received into evidence at the November 23, 1998, hearing. Father claims the juvenile court's reliance on this report without notice to the parties deprived father of the opportunity to cross-examine the hearsay declarants. Father argues he has made progress in counseling, and that the juvenile court's concerns about father's failure to correct mother's inappropriate behavior and father's belief mother is a good parent are insufficient to support the juvenile court's finding of a substantial probability that father will not be able to care for the minor by the 18-month date.

These assertions fail. A finding of fact by a juvenile court must be upheld on appeal if is supported by substantial evidence. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 [52 Cal.Rptr.2d 474]; *In re Carrie W.* (1978) 78 Cal.App.3d 866, 872 [144 Cal.Rptr. 427].) As previously noted, the evidence showed father lacked interest in any of the minors without mother's involvement, and father failed to appreciate mother's shortcomings and even anticipated reunification of the family in the Garden Grove apartment with mother. CSW Rezzato and WCC social worker Stogel both testified father had shown no improvement in his parenting skills over the life of this case. In sum, substantial evidence supports the juvenile court's finding that the objectives of Nicole's case plan could not be achieved by the 18-month date.

Father waived any evidentiary objections to the juvenile court's consideration of evidence regarding father's relationship with his two oldest children by failing to raise the issue below. Nonetheless, contrary to father's assertion, the evidence considered by the juvenile court was not derived from the

Orange County disposition report dated June 3, 1997, but was developed on cross-examination of father at the contested hearing. Accordingly, even assuming father could raise the objection for the first time on appeal, it would fail.

3. *The record supports the juvenile court's finding that DCFS offered father reasonable family reunification services.*

█ Father contends the juvenile court erred in setting a hearing under section 366.26 because it failed to find that DCFS had offered father reasonable family reunification services by clear and convincing evidence as required section 366.21, subdivision (g).

This claim is meritless. Although the clerk's transcript includes a minute order which recites the juvenile court found reasonable family reunification services had been provided by a preponderance of the evidence, the reporter's transcript indicates the juvenile court stated it found "that reasonable services have been provided to the parents. The Department has provided the parents with referrals, made the case plan clear to them, and has provided them with the opportunity to visit the children."

Thus, the record before this court indicates the juvenile court merely failed to state expressly the standard of proof under which it had made the determination that reasonable family reunification services had been provided. In light of the juvenile court's failure to articulate an incorrect standard, father's failure to request clarification of the record below, and the presumption the juvenile court applied the correct statutory standard of proof, this issue fails for want of a record which affirmatively demonstrates error.

### DISPOSITION

The petition is denied.

Kitching, J., and Aldrich, J., concurred.

Petitioner's application for review by the Supreme Court was denied June 16, 1999.