Filed 10/19/16; pub. order 11/17/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.G. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G053232 |
| Plaintiff and Respondent, | (Super. Ct. Nos. DP025984, 15DP0044) |
| v. | O P I N I O N |
| Z.G. et al., | |
| Real Parties in Interest and Appellants; | |
| C.G. et al., | |
| Defendants and Appellants. | |

Appeal from orders of the Superior Court of Orange County, Gassia Apkarian, Judge. Affirmed in part and reversed in part.

Leslie A. Barry, under appointment by the Court of Appeal, for Real Parties in Interest and Appellants Z.G. and I.L.

Michele Anne Cella, under appointment by the Court of Appeal for Defendant and Appellant C.G.

Marsha F. Levine, under appointment by the Court of Appeal for Defendant and Appellant H.L.

Leon J. Paige, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\*             \*             \*

Orange County Social Services Department (SSA) sought to remove Z.G. and I.L. (Children) from the custody of their parents (Parents), C.G. (Mother) and H.L. (Father), after Children's sibling, H.L., Jr. (Junior), died.  The juvenile court found Parents' "neglect" was a cause of Junior's death.  (Welf. & Inst. Code, §§ 300, subd. (f), 361.5, subd. (b)(4); all further statutory references are to this code.)  Even so, and although Parents essentially did nothing to move the family towards reunification, the court found reunification was in the "best interest" of Children.  (§ 361.5, subd. (c).)

Parents appeal from the jurisdiction and disposition orders and argue there is insufficient evidence to support the court's finding their neglect was a cause of Junior's death.  Thus, they contend the court erred by concluding Children were subject to jurisdiction under section 300, subdivision (f), and that Parents were subject to the reunification services bypass provisions of section 361.5, subdivision (b)(4).

Children appeal from the disposition order and contend there is insufficient evidence to support the finding reunification with Parents is in the best interest of Children.  Hence, they argue, the court abused its discretion by ordering reunification services for Parents under section 361.5, subdivision (c).  SSA joins in this argument.

We conclude there is sufficient evidence to support the court's finding Parents' neglect was a cause of Junior's death, but there is insufficient evidence to support the court's finding reunification with Parents was in Children's best interest. Therefore the court abused its discretion by ordering reunification services for Parents. Consequently, we will reverse that portion of the disposition order, but affirm the jurisdiction and disposition orders in all other respects.

2

## FACTS AND PROCEDURAL HISTORY

*1. Removals and Petitions*

Seven-month-old Junior died on March 9, 2015, while sleeping in a bed with Mother and Z.G. Mother found his body wedged between the bed, a pillow and a rolling portable desk. The coroner later determined Junior died from positional asphyxia, and ruled his death was an accident.

Twenty-two-month-old Z.G. was taken into protective custody the day Junior died. SSA then filed a juvenile dependency petition on her behalf. The petition alleged: Z.G. was at risk of physical harm as a result of Mother's failure to protect and inability to care for Z.G. (§ 300, subd. (b)), all due to Mother's unresolved substance abuse and mental health problems, and her criminal conviction history, including child abuse; and Mother caused Junior's death (§ 300, subd. (f)).

At an initial detention hearing on March 13, the court: found there was a prima facie showing Z.G. was a person within section 300 and should be detained by SSA; ordered SSA to provide reunification services to Parents; made temporary placement, visitation and drug testing orders; and set a combined jurisdiction and disposition trial.

Nine months later I.L. was born and tested positive for methamphetamine, and Mother tested positive for amphetamine, methamphetamine and marijuana. SSA took I.L. into protective custody and filed a juvenile dependency petition. The petition alleged: I.L. was at risk of physical harm as a result of Parents' failure to protect and inability to care for her (§ 300, subd. (b)) due to their unresolved substance abuse and mental health problems, and their criminal histories; Parents caused Junior's death (§ 300, subd. (f)); Parents were not participating in counseling services or drug testing (§ 300, subd. (j)), as ordered in Z.G.'s case; and Parents were not consistently visiting with Z.G.

3

At an initial detention hearing on December 16, the court: found the petition made a prima facie showing I.L. was a person within section 300 and ordered I.L. detained; ordered SSA to provide reunification services to Parents; again made temporary placement, visitation and drug testing orders; and set a combined jurisdiction and disposition trial with Z.G.

2. *SSA Reports*

Almost a year elapsed between the initial detention of Z.G. and the jurisdiction and disposition trial for Z.G. and I.L. In that time SSA prepared eighteen reports which were ultimately admitted into evidence and considered by the court at trial. The salient portions of the SSA reports are summarized below.

a. *Prior Child Abuse and Neglect Reports*

There had been numerous prior child abuse and neglect reports concerning the family, mostly pertaining to Mother's substance abuse. For example, an August 2014 report noted Mother had used both methamphetamine and marijuana while she was pregnant with Junior.

A December 2014 report noted Mother and Father had been riding in a car driven by a third person. Mother was holding Z.G. in her arms, instead of securing her in a car seat. The driver possessed methamphetamine and Mother marijuana, and both drugs were within reach of Z.G. Mother was arrested for possession of marijuana and child endangerment and was ordered to attend a 52-week child abuse program and a six-month parent education program.

b. *Death of Junior*

An investigation into the circumstances of Junior's death revealed that around 2:30 p.m. on Saturday, March 7, 2015, Mother smoked methamphetamine after she returned home from a court ordered parenting class for the criminal case. Mother did not sleep at all that night or the next day.

4

About 9:00 p.m. on Sunday, Parents put Z.G. and Junior in Mother's bed for the night. They had another bed and a crib for the kids but often did not use them. Around 10:00 p.m., Mother smoked concentrated cannabis wax.

Around 1:00 a.m. on Monday, March 9, Mother and Father went to sleep in the bed with Junior and Z.G. Around 6:00 a.m., Father put Junior back in the bed, on his side, between Mother and the wall. Father woke Mother, told her both children were in bed with her, and then left for work. When Mother woke about 8:30 a.m. she found Junior face down at the end of the bed, purple and not breathing.

*c. Reunification Services*

At the detention hearings in March and December 2015, the court ordered reunification services. The case plan and services included drug treatment, individual counseling, and parenting and child abuse programs. Mother said she had started her previously ordered child abuse and parent education programs but never provided proof of enrollment for either. Father had been terminated from his previously ordered parenting program due to absences. Mother attended only a few of her individual counseling sessions and Father never participated in individual counseling.

*d. Mental Health, Substance Abuse, Testing and Treatment*

Mother has a substantial mental health history, including bipolar, manic-depression, depression, and cutting issues. Mother admitted she had not taken her prescribed medications for over three years.

Mother also has a substantial illegal substance abuse history, including methamphetamine, cocaine, and marijuana use. Mother started using marijuana regularly when she was 15, and at times had a medical marijuana card. She admitted she had used methamphetamine while pregnant with both Z.G., and Junior.

Two days after Junior died, Mother acknowledged methamphetamine and marijuana had been found in her system, but denied she had used those drugs. The next day Mother admitted she had used marijuana the night before, but still claimed she had

5

not used methamphetamine, and insisted she was not an addict and was not under the influence when Junior died.

Father admitted using marijuana and "occasionally" methamphetamine, but denied knowing Mother used methamphetamine while she was pregnant.

At both detention hearings, the court ordered Parents to submit to random drug testing and encouraged Parents to participate in drug treatment. SSA suggested twice weekly self-help (Alcoholics Anonymous/Narcotics Anonymous) meetings and a drug treatment program.

Mother tested positive for marijuana seven times and missed two tests in March and April 2015. Father also missed two tests but otherwise tested negative in March and April. In May, both Parents stopped drug testing altogether, because, as Mother said: "The whole thing is just pissing me the hell off now." Mother never enrolled in a drug treatment program, and neither Parent ever participated in any 12-step meetings.

*e. Placements and Visitation*

Z.G. was initially placed in a group home, and was moved to a foster home in October 2015. I.L. was placed directly in the same foster home as Z.G. when she was released from the hospital in December, and both Children remained there together until the time of the trial in February 2016.

At Z.G.'s detention hearing in March 2015, the court ordered monitored visits for Parents, for a minimum of six hours per week. Parents agreed to visit three times a week, for two hours per visit.

At first Parents visited Z.G. consistently and it appeared Z.G. was "attached" to them. Father continued to visit consistently through April and May 2015, but Mother started missing visits, and at one point Father reported Mother was "no longer interested" in visiting Z.G.

6

In late May, Mother resumed visiting Z.G., but from then on she and Father both cancelled many scheduled visits. As a result, they only visited Z.G. a few times each month from May to December.

After I.L. was detained in December, Mother's visitation was increased to eight hours per week. Parents did not visit Children at all between January 7, 2016 and February 4, when Mother appeared to be under the influence.

When Parents did visit Z.G., their visits went well. Mother was attentive, nurturing, and appropriate. Z.G. did not always go to her immediately, but smiled and welcomed her hugs. Z.G. once asked, "did my mommy die?" At one visit, Z.G. said she did not want to go away from Mother. Mother was sometimes overly emotional during the visits.

### f. SSA Recommendations

In November and December 2015, SSA recommended the court sustain the Z.G. petition, remove Z.G. from parental custody, and provide reunification services. SSA continued to make these same recommendations, even after I.L. was born, and despite Parents' lack of progress toward reunification.

However, in January 2016, SSA changed its position, recommending the court sustain the petitions, declare Children dependents, remove them from parental custody, bypass reunification services under section 361.5, subdivision (b)(4), and set a selection and implementation hearing.

A social worker explained the change was based on Junior's death, which was a product of: "[M]other's altered state as a result of lack of sleep and being under the influence"; and Father's decision "to leave the children in [M]other's care despite her substance abuse and lack of sleep."

### 3. Trial Evidence

The petitions were tried together in February 2016. Parents both failed to appear, but were represented by counsel. The court admitted the SSA reports into

7

evidence.  The only witness who testified was Shelley Manzer, the social worker who prepared the SSA reports.

Manzer testified she was the dependency investigator in both cases from the initial detentions through the time of trial.  Manzer recommended the court bypass reunification services for both Parents.

Manzer felt Junior's death was caused by Parents' neglect.  She opined Mother was neglectful by cosleeping with the children while under the influence of drugs.  Manzer believed Mother's recent use of methamphetamine and potent concentrated cannabis wax, together with Mother's lack of sleep for two days, had left her in an altered state that contributed to Junior's death.

Manzer noted Junior died after he rolled over onto his stomach.  He was found face down at the foot of the bed.  He "would have had to pass . . . [M]other in order to get over there.  And if she didn't wake up to his movements or his cries because of an altered state, either being too tired or under the influence, that that could have resulted in how [Junior] passed away."

Manzer did not assume a "stone-sober mother" would have woken up, but she knew cosleeping was not safe, and opined being under the influence of drugs would exacerbate the risk.  Manzer had no "hard evidence" Mother was under the influence when Junior died, and did not know how long the drugs would have stayed in Mother's system, but said the drug use "could have played a role."

Manzer testified Father's neglect also contributed to Junior's death.  She believed Father failed to protect Junior from Mother's drug use.  She noted Father left Junior and Z.G. with Mother, despite knowing Mother had used methamphetamine and marijuana and had not slept for two nights.  Manzer later testified Father only admitted he knew Mother had used marijuana.

Manzer explained her reunification services recommendations changed after conferring with her supervisor and county counsel, reevaluating Z.G.'s case, and

8

conducting a full investigation in I.L.'s case. While her understanding of the circumstances of Junior's death had not changed, Parents had been "extremely inconsistent" in their visitation, and they had not engaged in any reunification services, plus I.L. had been born drug exposed.

*4. Trial Court Findings and Rulings*

The court found the jurisdiction allegations true under section 300, subdivision (b) (failure to protect Z.G. and I.L.), section 300, subdivision (f) (death of Junior through neglect), and section 300, subdivision (j) (abuse of Z.G. - failure to participate in reunification services, I.L. petition only). The court also found the reunification service bypass provisions of section 361.5, subdivision (b)(4) (death of Junior through neglect) applied; Parents' progress toward alleviating or mitigating the causes necessitating placement was "none"; continued placement was "necessary and appropriate"; and SSA had complied with the case plan.

The court expressed hesitation regarding the section 300, subdivision (f) finding. It noted the coroner had ruled Junior's death was an accident, and it did not know if Mother was still under the influence at the time Father put Junior back in the bed. The court further explained, "[t]here's a lot of dots I have to connect between mom and that dead child." But after extended discussion and careful consideration, the court specifically found Parents' neglect and drug use were "substantial or contributing . . . sufficient" causes of Junior's death.

However, the court then found reunification was in the best interest of Children and ordered SSA to provide reunification services to Parents under section 361.5, subdivision (c). The court explained, "To expect parents who lost a child to death to deal with their grieving process and expect them to just stand up and go to parenting programs and drug programs I think is next to impossible. [¶] . . . [¶] At the end of the day, the best parents would be the biological parents or the presumed father and biological mother of any child. [¶] And the court does not feel that it is fair to size them

9

up immediately after they've lost a seven-month-old child to death. People who don't have drug problems can start a drug habit once they're faced with the death of a child. [¶] So I am going to make the finding by clear and convincing evidence that pursuant to [section] 361.5 [subdivision] (b)(4), even though the court shall not provide services, there is clear and convincing evidence that it is in the best interests of the two surviving siblings for parents to receive services for purposes of reunification. And I don't think it's asking much to give these parents another chance. It's just not."

**DISCUSSION**

*1. There is Sufficient Evidence Parents' Neglect Was A Cause of Junior's Death.*

Parents contend the court erred by concluding Children were subject to jurisdiction under section 300, subdivision (f) (section 300(f)), and Parents were subject to reunification services bypass under section 361.5, subdivision (b)(4) (section 361.5(b)(4)), all because there is insufficient evidence to support the court's finding Parents' neglect was a cause of Junior's death. Specifically, Mother argues there is insufficient evidence to support the court's finding Parents' actions or omissions were a "substantial factor" in Junior's death, or to show that "but for" those actions or omissions, Junior would not have died. Father insists the causation evidence was speculative at best, not clear and convincing as required by section 361.5(b)(4), and thus it cannot support the finding Junior's death was caused by Parents' neglect. We are not persuaded.

The substantial evidence standard of review applies to the jurisdiction findings under section 300(f), and the reunification services bypass findings under section 361.5(b)(4). (*In re Mia Z.* (2016) 246 Cal.App.4th 883, 891 (*Mia Z.*); *In re Harmony B.* (2005) 125 Cal.App.4th 831, 843.) "Under this test, we resolve all conflicts in the evidence, and indulge all reasonable inferences that may be derived from the evidence, in favor of the court's findings. [Citation.]" (*Mia Z.*, at p. 891.)

Section 300(f) provides a child is subject to the jurisdiction of the juvenile court and may be declared a dependent, when: "The child's parent or guardian caused

10

the death of another child through abuse or neglect." Similarly, section 361.5(b)(4) states reunification services need not be provided to a parent or guardian when the court finds, by clear and convincing evidence "[t]hat the parent or guardian of the child has caused the death of another child through abuse or neglect."

The word "caused" as used in section 300(f) has the commonly understood meaning found in both criminal and civil law. (*In re Ethan C.* (2012) 54 Cal.4th 610, 639-640 (*Ethan C.*).) "Nothing in the plain language, or the history, of section 300(f) suggests the Legislature had a more restrictive concept of 'cause[]' in mind for purposes of that statute." (*Id.*, at p. 640.) The same is equally true with respect to the word "caused" as used in section 361.5(b)(4).

"One's wrongful acts or omissions are a legal cause of injury if they were a substantial factor in bringing it about. [Citations.] If the actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct. Conversely, if the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial factor in the harm. [Citations.]" (*Ethan C.*, *supra*, 54 Cal.4th at p. 640; see *Mia Z.*, *supra*, 246 Cal.App.4th at p. 892. "Moreover, the 'substantial factor test' subsumes the 'but for' test." (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052.)

These causation principles were discussed and applied in *Mia Z.* There, "Destiny [the child] walked away from Mother's apartment and ended up about 120 feet away, in a well-trafficked alley fronting a commercial parking lot. While Destiny was standing in the alley, a heavy metal rolling gate at the access to the parking lot fell off its track and landed on Destiny, striking her in the head," and killing her. (*Mia Z.*, *supra*, 246 Cal.App.4th at p. 885.)

Destiny's mother argued the evidence was not sufficient to support the jurisdictional finding, "because, while it undisputedly showed a lack of parental

11

supervision at the time of Destiny's death, it did not show that this lack of parental supervision 'caused' Destiny's death within the meaning of section 300, subdivision (f) in that it did not show that the lack of parental supervision was a 'substantial factor' in causing the child's death." (*Mia Z.*, *supra*, 246 Cal.App.4th at p. 891.)

The court disagreed and explained: "In actuality Mother's neglect was that she allowed her three-year-old child to walk away unattended from the family home, thus exposing her to dangers of all kinds. That is, she did not keep an eye on her child at the family home in the first instance. [¶] . . . [¶] Mother's neglect . . . was a substantial factor, along with Destiny's own locomotion, and along with the children who pushed down the gate, in causing her death. Mother's argument . . . focuses too much on the end event causing Destiny's death, and ignores that there may be multiple concurrent causes of an end event. [Citation.] Mother's causation argument fails because it overly focuses on the specific instrumentality of Destiny's death, the falling gate, and ignores that Mother's conduct put Destiny on the path to be in the place where that instrumentality was ultimately applied. In answering the question of what elements contributed to cause Destiny's death, it is appropriate to look at the entire chain of events leading to her death, not merely the final event directly causing her death. . . . The evidence in the record supports a finding of factual, 'but for,' causation between Mother's negligent supervision and her daughter's death." (*Mia Z.*, *supra*, 246 Cal.App.4th at pp. 891-892.)

Much the same can be said regarding the causation evidence here. Parents' neglect was putting seven-month-old Junior in the same bed with Parents and 22-month-old Z.G., instead of putting him in his crib in the first instance, thus exposing him to dangers of all kinds. As Manzer testified based upon her training, infant cosleeping is not safe because, "you run the risk of potentially rolling over on your child or extra blankets or pillows that could potentially suffocate the child."

Plus, the ordinary risks of cosleeping were magnified by the undisputed links in the chain of events leading to Junior's death. Mother had not slept for two days,

12

after using methamphetamine. She had also used concentrated cannabis wax, a potent form of marijuana, the night before Junior died. It is reasonable to infer, as Manzer testified, these circumstances left Mother in an "altered state." Father, aware of these circumstances, still put Junior back in the bed with Mother and Z.G and left.

Thus, substantial evidence supports the finding Parents' neglect was a substantial factor, along with Junior's own locomotion, in causing his death. Regardless of the specific instrumentality of his death, positional asphyxia, Parents' conduct put him on the path to be in the place where that instrumentality was ultimately applied, under circumstances which increased the risk that instrumentality would in fact be applied. In short, Junior's death would not have occurred "but for" Parents' neglect.

Our conclusion obtains regardless of whether Mother was or was not under the influence of illegal drugs at the time of Junior's death. It may be reasonable to infer, as Manzer testified, these things "could have played a role." But we need not do so because the undisputed evidence in the record supports the factual finding of causation between Parents' neglect and Junior's death.

The two infant cosleeping cases cited by Mother do not compel a contrary conclusion. *In re A.M.* (2010) 187 Cal.App.4th 1380 (*A.M.*) and *In re Ashley B.* (2011) 202 Cal.App.4th 968 (*Ashley B.*) both held substantial evidence supported the trial courts' findings the parents' neglect was the cause of the infant's death while cosleeping.

In *A.M.*, six-day-old James died, while sleeping in the same bed as his father, D.M., his mother, Tiffany, and his brother, Gavin M. (*A.M.*, *supra*, 187 Cal.App.4th at pp. 1382, 1384-1385.) D.M. challenged the sufficiency of the evidence to support the court's jurisdictional findings under section 300(f).

The court rejected this challenge and explained: "Here, there is sufficient evidence to support the [trial] court's findings. . . . D.M. stated that when he was in the family bed, he 'pushed' James as far as he could toward Tiffany in hopes that she would wake up and attend to James's crying. D.M. later admitted he heard James struggling to

13

breathe and that James was not breathing normally. . . . As the trial court stated, D.M. recognized there was a risk to James and he had the ability to 'qualify, quantify and assess the risk, and, more importantly, [was] in a position and [had] the means to intervene.' D.M., however, did not intervene even though he heard James struggling to breathe. The evidence is sufficient to support the juvenile court's finding that D.M. caused the death of James through neglect." (*A.M.*, *supra*, 187 Cal.App.4th at p. 1388.)

Mother contends *A.M.* "provides the kinds of facts necessary to show 'but for' causation—facts that are missing in this case." She further maintains "*A.M.* demonstrates a situation where, but for the father's failure to intervene when he heard the baby's labored breathing, the baby would not have died."

We agree the facts in *A.M.* are different than the facts in this case, but we do not agree different facts necessarily lead to different results. Nothing in *A.M.* or any of the cases cited in *A.M.* suggests causation cannot be found in other facts, like the facts in this case. Nor could it be so. Rather, this case, like *Mia Z.*, merely represents a straightforward application of the causation principles outlined in *Ethan C.*

Mother points to one final distinction between this case and *A.M.* She notes: "[T]he coroner in the instant case did not cite 'overlay' as a cause of death; thus, the cause of death was not [Mother's] act of rolling over onto Junior, but the fact that Junior moved himself into a position that caused him to suffocate."

This argument, like the mother's argument in *Mia Z.*, "focuses too much on the end event causing [the] death, and ignores that there may be multiple concurrent causes of an end event. [Citation.]" (*Mia Z.*, *supra*, 246 Cal.App.4th at p. 892.) To paraphrase *Mia Z.*, it "fails because it overly focuses on the specific instrumentality of [Junior's] death, [positional asphyxia], and ignores that Mother's conduct put [Junior] on the path to be in the place where that instrumentality was ultimately applied." (*Ibid.*)

In *Ashley B.*, one-month-old Jose died, while sleeping in the same bed as his father, his mother, and his sister, Ashley. (*Ashley B.*, *supra*, 202 Cal.App.4th at pp.

14

970-971.) Ashley's mother argued the juvenile court erred when it sustained a jurisdiction finding under section 300, subdivision (j) (abuse or neglect of sibling) based on the circumstances leading to the death of Jose. (*Id*. at p. 970.) Specifically, the mother argued substantial evidence did not support the trial court's implied determination she was abusive or neglectful in connection with Jose's death. (*Id*. at p. 982.)

The court of appeal rejected these arguments and noted: "The evidence before the juvenile court showed that mother and father ignored the discharging hospital's instructions that Jose, a premature infant who had suffered from sleep apnea while hospitalized, should be placed to sleep in his crib on his back. Both [family services] and the coroner noted that Jose's crib was broken . . . . This evidence was sufficient to support a conclusion that neither mother nor father was ensuring that Jose was put to bed safely." (*Ashley B*., *supra*, 202 Cal.App.4th at p. 982.)

Mother contends "*Ashley B*. presents a scenario where the baby died in a very similar way even without evidence the parents used drugs. Hence the parents' drug use cannot be a 'but for' cause of Junior's death." We agree Junior died in a similar way, and Mother's drug use alone cannot be the but for cause of his death. But Mother's drug use and lack of sleep, together with Father's awareness of these events, and their decision not to use a crib, all support the conclusion that Parents, like Jose's parents, neglected to ensure Junior was "put to bed safely." (*Ashley B*., *supra*, 202 Cal.App.4th at p. 982)

Father contends the court did not actually find section 361.5(b)(4) applied, or a least did not make that finding by clear and convincing evidence as required. It is true the court clerk's minutes do not reflect a section 361.5(b)(4) finding, but the court reporter's transcript does. We reconcile this conflict in favor of the reporter's transcript, since "the particular circumstances [do not] dictate otherwise." (*In re Merrick V*. (2004) 122 Cal.App.4th 235, 249.) Unless it had first made the predicate finding under section 361.5(b)(4), the court would have had no reason to make the finding under section 361.5, subdivision (c) (section 361.5(c)).

15

But that does not end the matter, because the court's oral finding is confusing. The court stated: "So I am going to make the finding by clear and convincing evidence that pursuant to 361.5(b)(4), even though the court shall not provide services, there is clear and convincing evidence that it is in the best interest of the two surviving siblings for parents to receive services for purposes of reunification."

Father argues both of the court's references to "clear and convincing evidence" in this statement relate only to the section 361.5(c) best interest finding, not to the section 361.5(b)(4) reunification services bypass finding. We are not persuaded. Looking at the entire statement, we conclude the court's first reference to clear and convincing evidence relates to the section 361.5(b)(4) finding, and the second reference relates to the section 361.5(c) finding.

Our construction of the court's statement is consistent with the context in which it was made. In a colloquy with Mother's counsel the court had just acknowledged that although the preponderance of the evidence standard applied to the section 300(f) finding, the clear and convincing evidence standard applied to the section 361.5(b)(4) finding. Further, "In light of . . . father's failure to request clarification of the record below, and the presumption the juvenile court applied the correct statutory standard of proof, this issue fails for want of a record which affirmatively demonstrates error." (*Armando D. v. Superior Court* (1999) 71 Cal.App.4th 1011, 1025.)

Father next contends there is insufficient evidence to support the finding under section 361.5(b)(4). He posits the court had "extraordinary difficulty" finding, by a preponderance of the evidence under section 300(f), that Junior's death was caused by Parents' neglect. From this he reasons, "it defies logic to even suggest that the record" supports the finding, by clear and convincing evidence under section 361.5(b)(4), that Junior's death was caused by Parents' neglect.

This argument fails because it ignores the limited scope and nature of our review in three respects. First, we review the court's ruling, not its reasoning. (*In re B.L.*

16

(2012) 204 Cal.App.4th 1111, 1116.) So it makes no difference whether the court expressed hesitation about the section 300(f) finding or had trouble connecting the dots.

Second, "'"'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.] 'Thus, on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.]" (*In re J.I.* (2003) 108 Cal.App.4th 903, 911.)

Third, "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

For all of these reasons, we reject Parents' claim the court erred by concluding Children were subject to jurisdiction under section 300(f), and Parents were subject to reunification services bypass under section 361.5(b)(4). We reiterate, substantial evidence supports the finding Parents' neglect was a substantial factor in causing Junior's death, and but for that neglect Junior would not have died. Parents have not met their burden to show otherwise. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.)

*2. There is Insufficient Evidence Reunification is in the Best Interest of Children*.

17

Children and SSA contend the court abused its discretion by ordering SSA to provide reunification services for Parents under section 361.5(c), because there is insufficient evidence reunification is in Children's best interest. We agree.

"When sufficiency of the evidence to support a finding is challenged on appeal, the appellate court determines if there is any substantial evidence to support the finding. [Citation.] Moreover, the court cannot reverse the juvenile court's determination, reflected in the dispositional order, of what would best serve the child's interest, absent an abuse of discretion. [Citation.]" (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 64-65 (*Ethan N.*).)

Section 361.5(c) provides in relevant part: "The court shall not order reunification for a parent or guardian described in paragraph (3), (4), . . . or (16) of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." Thus, once the court found section 361.5(b)(4) applied, "'the general rule favoring reunification [was] replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]'" (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744.) At that point, the burden shifted to Parents to affirmatively establish reunification would be in the best interest of Children. (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*); *Ethan N.*, *supra*, 122 Cal.App.4th at p. 66.) This they failed to do.

"Subdivision (b)(4) of section 361.5 evidences the Legislature's recognition that some situations are so extreme as to require extraordinary caution in recognizing and giving weight to the usually desirable objective of family preservation. As noted in *In re Alexis M.* [citation], when child abuse results in the death of a child, such abuse 'is simply too shocking to ignore' in determining whether the offending parent should be offered services aimed at reunification with a surviving child. 'The fact of a death and a subsequent petition . . . arising out of that death simply obliterates almost any possibility of reunification . . . .' [Citation.]" (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 65.)

18

"The Legislature has, nevertheless, left open a 'tiny crack' to the parent who has been responsible for the death of his or her child. [Citation.] Subdivision (b)(4) of section 361.5 can be overcome by a showing, made with clear and convincing evidence, that reunification would be in a surviving child's best interest. [Citation.]" (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 65.)

"The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citation.]" (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 66.)

The factors to consider include: "a parent's current efforts and fitness as well as the parent's history"; "[t]he gravity of the problem that led to the dependency"; the relative strength of the bonds between the children and the parents and between the children and the caretakers; and "the child[ren]'s need for stability and continuity." (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 66-67.)

Further, "Under these circumstances, at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some 'reasonable basis to conclude' that reunification is possible before services are offered to a parent who need not be provided them. [Citation.]" (*William B.*, *supra*, 163 Cal.App.4th at pp. 1228-1229.)

We will analyze each of these best interest factors in turn.

First, consider Parents' histories. Mother has a substantial mental health and substance abuse history. She used a variety of illegal drugs while pregnant with all three children and alcohol while pregnant with Junior. She was convicted of child endangerment for failing to secure Z.G. in a car seat after she had used marijuana. She then failed to complete her court-ordered child abuse and parent education programs.

Father too has a substance abuse history, and knew Mother was using drugs while pregnant with Junior and I.L. and did nothing about it.

19

Also, there had been other child abuse and neglect reports concerning the family before, mostly pertaining to Mother's substance abuse. And of course, Mother's drug use and her related lack of sleep were a substantial factor in causing Junior's death.

Second, consider Parents' current lack of efforts to address these issues. They only briefly participated in both the various services offered and drug testing. The court apparently excused their lack of participation because it was unrealistic to "expect them to just stand up and go to parenting programs and drug programs."

Third, consider the gravity of the problem that led to the dependency here. "It is difficult to imagine any problem more grave than the previous death of another child caused by abuse or neglect. Assuming, without deciding, that the factor of another child's death should not be weighed twice—first in connection with the section 361.5, subdivision (b)(4) finding and again in determining best interest—we must remember that, here, the previous death of another child is combined with a long history of drug abuse . . ., and the abuse and neglect of other children even after extensive reunification services had been provided." (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 66.) And it is important to note substance abuse is very difficult for parents to overcome, even when faced with the loss of their children. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9.) Using illegal drugs instead of prescribed medications to treat mental health issues only compounds the problem. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1652-1653.)

Fourth, consider the relative strength of the bonds between Children and Parents, and between Children and their foster home caretakers. Parents were granted visitation with Z.G., and later with Z.G. and I.L., for a minimum of six hours per week (eight hours for Mother and I.L.). Parents visited only sporadically, although they interacted appropriately with Z.G. and I.L.

Z.G., who was almost two years old, originally appeared to be attached to Parents after her detention in 2015. However, by the time of the trial in February 2016, she no longer evidenced any attachment to Mother or Father, perhaps because their visits

20

were not consistent. I.L. was detained at birth, and she had no opportunity to bond with Parents because their visits were so inconsistent.

Z.G. was placed in a foster home on October 2, 2015, and I.L. was placed in that same home when she was released from the hospital on December 14. They adjusted well to their foster parents. By late November 2015, Z.G. called her foster mother "mama." The foster parents were the only parents I.L. has ever known.

Fifth, consider Children's needs for stability and continuity. Children "have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that [which] allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.)

Z.G. was neglected in the womb and throughout the time she lived with Mother. Just before her second birthday, she was traumatized by Junior's death. She continued to suffer instability when she spent over six months at a group home. Thus, the only stability Z.G. has ever known was provided by her foster home.

I.L. too was neglected before she was even born positive for methamphetamine. She has been placed in a family foster home since she was four days old, and that is the only stability she has ever known.

Finally, consider whether there is any reasonable basis to conclude reunification with Parents is possible. The court did not and, on these facts, could not make a finding that providing Parents further reunification services would have had a likelihood of success. Parents had been provided 11 months of reunification services between the death of Junior in March 2015, and the trial in February 2016, and they essentially did nothing to avail themselves of those services. And nothing in the record before us even remotely suggests they were going to change that behavior.

In sum, we conclude there is insufficient evidence to support the finding reunification was in the Children's best interest. In reaching the contrary conclusion, the court does not appear to have properly considered the factors which it was required to

21

consider. Instead, the court evidently based its finding on a desire, "to give these parents another chance." But ordering SSA to provide further reunification services to Parents under these circumstances was "asking much." The court effectively placed Parents' interest ahead of Children's best interest, and in the process abused its discretion. (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 68.)

In the end, we come back to the "enormous hurdle" faced by a parent seeking reunification with a child after causing the death of another child by abuse or neglect. (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 68.) "The cases in which a parent who has been responsible for the death of a child through abuse or neglect will be able to show that reunification will serve the best interest of another child or other children will be rare." (*Ibid.*) This case is not one of those rare cases.

## DISPOSITION

The portion of the disposition order granting reunification services to Parents is reversed. The challenged orders are affirmed in all other respects.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.


22

Filed 11/17/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.G. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. Z.G. et al., Real Parties in Interest and Appellants; C.G. et al., Defendants and Appellants. | G053232 (Super. Ct. Nos. DP025984, 15DP0044) ORDER CERTIFYING OPINION FOR PUBLICATION |

Real parties in interest and appellants, and respondent requested that our unpublished opinion, filed on October 19, 2016, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).

The request for publication is GRANTED. The opinion is ordered published in the Official Reports.

THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.