Filed 2/28/22  R.V. v. Superior Court CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| R.V.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>RIVERSIDE COUNTY,<br><br>        Respondent;<br><br>RIVERSIDE COUNTY DEPARTMENT<br>OF PUBLIC SOCIAL SERVICES,<br><br>        Real Party in Interest. | E078199<br><br>(Super.Ct.No. SWJ1400309)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Michael J. Rushton, Judge.  Petition denied.

Daniel L. Vinson for Petitioner.

No appearance for Respondent.

1

Gregory P. Priamos, County Counsel, James E. Brown, Theresa K. B. Beecham and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Real Party in Interest.

Petitioner R.V. (Father) and E.V. (Mother; collectively Parents) are the parents of C.V. (female, born 2014), R.V. (male, born 2018), Re.V. (female, born 2019),[1] and Ru.V. (female, born 2021; hereafter, Minor). Father has filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452. Father claims that the juvenile court erred in denying reunification services and in setting a hearing under Welfare and Institutions Code[2] section 366.26 with respect to Minor. For the reasons set forth below, we deny Father's writ petition.

## FACTUAL AND PROCEDURAL HISTORY[3]

A. THE FIRST DEPENDENCY PROCEEDINGS INVOLVING C.

1. *DETENTION*

"In April 2014, [Riverside County Department of Public Social Services (DPSS)] filed a dependency petition under section 300, subdivisions (b) (failure to protect) and (g) (no provision for support) on behalf of C., a newborn child, alleging mother's

---

[1] This writ does not involve Mother, C.V., R.V., or Re.V.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3] The factual and procedural history is taken from our unpublished opinions in related cases involving Minor's siblings. (*In re C.V.* (Aug. 14, 2020, E074625) [nonpub. opn.; *In re R.V.* (Sept. 23, 2021, E077193) [nonpub. opn.], internal quotes omitted.)

2

incarceration and ongoing mental health issues, and father's ongoing mental health, anger, and substance abuse issues, impaired their ability to care for the child. On April 14, 2014, the juvenile court found prima facie evidence to remove C. from her parents' care."

## 2. *JURISDICTION AND DISPOSITION REPORT AND HEARING*

"According to the jurisdiction/disposition report filed May 9, 2014, mother was adopted by the maternal grandfather and his first wife, who passed away when mother was nine years old. The maternal stepgrandmother [MSG] informed the social worker that mother got bad into drugs in 2008 (using methamphetamine, cocaine, PCP, and uppers), refused to remain in each rehabilitation center she was enrolled in, became physically abusive, and was diagnosed with schizophrenia and bipolar disorder. Mother's incarceration was for a domestic violence incident involving a knife and the paternal grandfather.

"At the May 14, 2014 jurisdiction/disposition hearing, the court sustained the allegations in the first amended petition, declared C. a dependent, removed her from parents' custody, and ordered reunification services and visitation. Both parents filed Judicial Council form ICWA-020 (parental notification of Indian status) indicating they had no Indian ancestry as far as they knew."

## 3. *SIX-MONTH STATUS REVIEW REPORT AND ADDENDUM*

"In the six-month status review report filed October 31, 2014, the social worker reported father was unemployed but living with his parents. He was compliant with his case plan and consistent with visitation. According to the addendum report filed

3

December 16, 2014, mother was compliant with her case plan while incarcerated and after her release on October 31, 2014. Although she was eager 'to get to know and care' for her daughter, she refused to acknowledge any history of substance use, misuse or abuse. On December 19, 2014, the court continued parents' reunification services and ordered mother to submit to a psychological evaluation if recommended by her therapist."

4. *TWELVE-MONTH STATUS REVIEW REPORT AND HEARING*

"In the 12-month status review report filed May 28, 2015, the social worker stated that both parents remained compliant with their case plans, they continued to make efforts to improve their lives free from drugs and alcohol, and there were no safety concerns. On June 10, 2015, based on DPSS's recommendation, the juvenile court placed C. with her parents on a family maintenance plan and on the condition the paternal grandparents provide support."

5. *SECTION 387 PETITION*

"Less than four months later, DPSS initiated supplemental proceedings (§ 387) to remove C. from mother's care based on her continued abuse [of] controlled substances and [her] noncomplian[ce with] her Court ordered case plan. According to the section 387 detention report filed September 24, 2015, as of August 3, 2015, she was using methamphetamine and living on the streets. On September 22, 2015, C. was removed from mother's care but remained in father's custody.

4

"In the jurisdiction/disposition report filed October 27, 2015, the social worker stated mother was located at the maternal grandparents' home, however, she was deteriorating behaviorally and cognitively. A psychological evaluation revealed she was suffering from a severe neuro-cognitive disorder due to her extensive methamphetamine abuse. Mother was described as being grossly impaired and unable to take care of herself. On November 2, 2015, the court sustained the allegations in the second amended section 387 petition and terminated mother's reunification services. On December 10, 2015, family maintenance services were continued as to father.

"On May 6, 2016, father filed an ex parte request to terminate dependency proceedings. The request was granted; father was given primary legal and physical custody of C., and supervised visitation was authorized for mother."

B.      THE SECOND DEPENDENCY PROCEEDINGS INVOLVING C. AND R.

1.      *DETENTION*

"On September 21, 2018, DPSS received a referral alleging general neglect. Mother, who was nine months pregnant, claimed father had punched her in the face. Two prior referrals were received in 2017 concerning mother and father engaging in domestic violence. A police officer informed the social worker that the family is well known to law enforcement and they have each been arrested multiple times for being the aggressor in a domestic violence assault. In October 2018, mother gave birth to a baby boy, R. Mother told the social worker she and father had gotten back together a few months after the prior dependency had closed. Mother disclosed she began using methamphetamine at

5

the age of 19 but became sober in 2016, when she was 28 years old. She stated she was diagnosed with anxiety and depression but had not taken any psychotropic medications in 11 months. Mother admitted to slapping father in the face but denied that he had assaulted her. The social worker interviewed C., who stated she had witnessed physical fights between her parents. When confronted with C.'s statements, mother called C. a compulsive liar. The social worker also spoke with father; however, he presented with disjointed thoughts, delusional thinking, and some dichotomous reasoning.

"On November 2, 2018, DPSS filed a dependency petition under section 300, subdivision (b)(1) (failure to protect) on behalf of C. and R., alleging both parents have criminal histories and expose the children to ongoing acts of domestic violence, and father has unresolved mental health and anger issues. Each parent filed parental notification of Indian status forms indicating no Indian ancestry; however, upon hearing that mother was adopted, the juvenile court asked the maternal grandfather if he had any information related to the mother having Indian ancestry. He replied, No. On November 5, 2018, the children were removed from their parents' custody."

2.    *JURISDICTION AND DISPOSITION REPORT AND HEARING*

"According to the jurisdiction/disposition report filed November 26, 2018, the children were placed with the maternal grandparents. The social worker opined that [d]espite the parents participating in Court ordered services, they failed to benefit from the services. She identified the substantial history of domestic disputes as the primary problem necessitating intervention. Other concerns included their undiagnosed and/or untreated mental health issues, the ongoing history of drug use, not limited to marijuana

6

and cocaine, and mother's previous diagnosis of schizoaffective disorder due to her history of drug use. Mother informed the social worker that she was adopted by a social worker at McClaren Hall in El Monte when she was two or three years old.

"On November 29, 2018, the court sustained most of the allegations in the first amended supplemental petition, declared the children dependents of the court, ordered reunification services for both parents, and ordered father to participate in a medication assessment and psychological evaluation."

3. *SUBSEQUENT REPORTS CONCERNING DOMESTIC VIOLENCE AND VISITATION*

"In the social worker's report filed March 11, 2019, it was noted that father's anger management issues appeared to be escalating. On January 23, 2019, mother went to the police station asking to obtain a temporary restraining order against father, but she left without following through. On February 14, 2019, two calls were made to law enforcement regarding domestic violence. The next day, father reportedly punched his pregnant wife in the stomach, slapped her, and threw her to the ground several times. Mother was hospitalized. The court issued an emergency protective order, but mother returned home soon after the incident and recanted the allegations. Father was diagnosed with Bipolar and Related Disorder, Hypomanic Episode W/O Prior Major Depressive Episode, Delusional Disorder Grandiose Type, and Narcissistic Personality Disorder. His therapist opined that father might require a higher level of care or medication management.

"On April 18, 2019, DPSS filed an addendum report to address liberalizing mother's visitation. The social worker recommended no change in visitation orders. While mother had completed a parenting class and an outpatient substance abuse program, and had been consistently testing negative for controlled substances, the social worker expressed concerns about the continued domestic violence. In addition to the previously reported domestic violence calls to law enforcement, calls were made on March 7, March 20, and April 5, 2019. Father admitted he smoked marijuana on a daily basis and prior to his visits with the children. The social worker advised that he should not be under the influence while visiting or caring for the children. When mother visited the children, she spent much of the visit with [R.] because 'the baby requires more attention and C. did not play with mother."

4.    *SIX-MONTH STATUS REVIEW REPORT*, *ADDENDUM*, *AND CONTESTED HEARING*

"According to the six-month status review report filed May 10, 2019, DPSS recommended terminating reunification services as to both parents and setting a section 366.26 hearing with a permanency goal of adoption. The social worker noted both parents' prior denial of any Native American ancestry but related that mother, on May 7, 2019, stated a DNA ancestry test showed she was 58 percent Native American. Mother had no information as to her ancestral tribe because her bio mother is deceased and bio father unknown. While both parents had made progress on their case plans, they did not appear to be benefitting from their participation in Domestic Violence services. Dr. Robert Suiter conducted a psychological assessment of father and opined there were

8

no reassurance[s] at all that [father] would benefit from services. Both parents regularly visited the children. On May 30, 2019, the court set a contested six-month status review hearing.

"In its addendum report filed June 18, 2019, DPSS continued to recommend terminating services and setting a section 366.26 hearing. The social worker reported another domestic violence incident in May 2019, when father yanked the ignition out of their car, leaving mother stranded in the middle of the street outside DPSS's office. Father was angry and stated the social worker had a personal vendetta against him and [was] racist against Mexicans. Based on father's demeanor and erratic behavior, DPSS determined it would not be safe for the children to visit with him that day. Father continued to test positive for marijuana. Mother was diagnosed with P-Intermittent Explosive Disorder, Unspecified Depressive Disorder, and Schizophrenia. She had not reached her goal of increasing insight and identifying effective coping and parenting skills as she exhibited aggressive behavior, verbal and physical, three times per week. Her therapist expressed many concerns, including mother's minimization of her domestic violence and blaming others for her behavior, and recommended continuing therapy. According to mother's psychological evaluation, her prognosis was favorable only to the degree she could remain separated from father and take her prescribed medications.

"On June 27, 2019, the court noted there was reason to believe the children may be of Indian ancestry and that ICWA may apply. Nonetheless, the court terminated reunification services and set a section 366.26 hearing with a permanent plan of adoption.

9

Both parents filed notices of intent to file a writ petition; however, the petitions were dismissed."

   5. *ICWA NOTICES*

 "On August 13, 2019, DPSS served and filed ICWA notices for each child. Notice was provided to the Bureau of Indian Affairs (BIA) and the U.S. Department of the Interior. The notices identified mother's married and maiden names (not her birth name), her date and place of birth, and the biological maternal grandmother's name. Regarding additional information, the notices provided: 'Mother was interviewed on 5/15/19 by Social Services Practioner [*sic*], Stacy Vasquez, and a CSD 4597 was emailed to ICWA noticing on 5/15/2019. Mother indicated per her DNA test she discovered she was 58% Native American. Tribe is unknown at this time. Mother was adopted around 2 to 3 years old and was unable to provide any identifying information on her biological parents other than a first and last name of her biological mother. A search of C-IV and Accurint was conducted on 7/22/2019 and a print out of all known family members and associates was forwarded to the Social Services Practioner [*sic*] on 7/23/2019. On 6/27/2019, step maternal grandmother, [MSG], was interviewed by Noticing Office Assistant, Christy Alcocer. She provided family information for the adoptive family.' The U.S. Department of the Interior was unable to determine tribal affiliation because the notice contained insufficient information."

6. *SECTIONS 366.26 AND 366.3 STATUS REVIEW REPORT AND*

*ADDENDUM*

"According to the sections 366.26 and 366.3 status review report filed October 11, 2019, parents' visitation with the children became sporadic because mother was again pregnant, and she asked to suspend visitation until after the baby was born, and father had canceled several visits. In September 2019, mother gave birth to a baby girl, Re.[4]

"In its addendum report filed December 24, 2019, DPSS continued to recommend termination of parental rights as to C. and R. and adoption by the maternal grandparents with whom the children had been residing since November 5, 2018. According to the maternal grandparents, the children saw them as their parents' and look to them when they want to be cuddled, play, or have their needs met. The maternal grandparents fully understood that adoption was a lifelong commitment, wanted to always be there for the

---

[4] "On October 16, 2019, DPSS filed a dependency petition under section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of a sibling) on behalf of Re. based on both parents' substantiated allegations of general neglect of their older children, who had been exposed to acts of domestic violence. According to the detention report, both parents denied having tribal linkage pertaining to Native American and/or Alaskan heritage. Each parent filed separate parental notification of Indian status forms indicating the same. Mother refuted her prior report of a domestic violence incident from February 2019, claiming that she passed out and must have imagined something happened that did not happen, or attributed it to her being pregnant and having hormonal issues. Father also denied the incident, asserting mother was making it up. Father stated that he and mother know not to tattle-tell on each other now. Law enforcement had not received any calls from the home since May 2019. On October 17, 2019, the juvenile court detained [Minor]. On November 7, 2019, the court found [Minor] came within section 300, subdivisions (b)(1) and (j), adjudged her a dependent of the court, and allowed her to remain in both parents' care, with family maintenance services."

11

children, and believed they could provide the children with stability, love, and attention. C. wanted the maternal grandparents' home to be her forever home."

    7.    *SECTION 388 PETITIONS*

"Father filed a section 388 petition as to each child on December 31, 2019, and mother filed the same on January 2, 2020.  Both parents sought to reinstate family reunification services.  As for changed circumstances, father asserted he is currently on Family Maintenance as to [Minor] and is progressing well in his services, has been attending individual therapy, a substance abuse program through MFI Recovery Center and has been testing clean, is completing a parenting program through Safe Care, and he is also enrolled in a Domestic Violence program and group therapy through Cox Romain. As for mother's changed circumstances, she asserted she is on Family Maintenance as to her youngest daughter [Minor] and is doing well in her services, and is currently enrolled in domestic violence classes, has been attending individual therapy, and parenting at home care.  Both parents claimed to have benefited from the services received; father added that he has cooperated with DPSS and has participated in appropriate and positive visits, while mother stated that she loves her children very much and believes that it is in their best interest for the Court to order Family Reunification Services so they can reunify with their youngest sister who is on FM with the parents.  A hearing on the section 388 petitions was set.

"On January 17, 2020, the maternal grandparents requested de facto parent status.

12

"DPSS opposed the section 388 petitions on the grounds (1) the parents circumstances may be changing, [but] they have not changed, and (2) re-establishing reunification services to them would be detrimental and not in the best interest of these children. Although both parents visited the children, R. did not remember them and seemed traumatized and crie[d] often during the visits, and C. appeared to play on her own a lot. The social worker opined the children did not appear to see [mother and father] as their parents. They do not look forward to the visits and [C.] often seems indifferent, except when it comes to comforting her brother. Even though they were participating in therapy and domestic violence programs, their circumstances had not changed."

### 8. *SECTIONS 388 AND 366.26 HEARING*

"A contested section 366.26 hearing in combination with a hearing on the section 388 petitions was held on January 27, 2020. The court also heard the maternal grandparents' request for de facto parent status. Father provided stipulated testimony that (1) he had benefited from services, (2) he had completed a substance abuse program, (3) he was not using marijuana, (4) he had attended five Narcotics Anonymous (NA) meetings (but had forgotten to bring his signed cards to the hearing), (5) he had participated in eight sessions of a domestic violence program, four to five sessions of individual counseling, and some marriage counseling, and (6) Re. was safe in his care. Mother also provided stipulated testimony that (1) she had attended four to five individual counseling sessions, eight domestic violence classes, and some marital counseling courses, (2) she had benefitted from the courses, (3) there was no additional

13

domestic violence in her relationship with father, and (4) her home was suitable for the children. In response, the children's counsel acknowledged both parents' participation in various programs; however, counsel argued there was no change in their circumstances, and it was not in the best interest of the children to provide further reunification services to mother and father. DPSS concurred.

"The court denied the section 388 petitions. The court noted the history of the case was replete with domestic violence, dating back to 2014, and that both parents had poor mental health. The court opined that as to the historical issues related to this couple, the severity of those issues, how they relate to both of your mental health issues, and a chronic history of substance abuse, a few months of either sobriety or not hurting each other and not calling the police on each other does not mean that the underlying issues in this case are resolved. The court expressed concern that both parents were basically white-knuckling it. Thus, the court stated, the entire history of this particular case is so extreme that the efforts made by the parents most recently are de minimis and result, at most, in what the Court would view as changing circumstances. Regarding the best interests of the children, the court observed the children to be very bonded to their current caretakers. [R.] really knows no other parents. [C.] has very negative memories of her parents and a very positive outlook on her current environment.

"The juvenile court granted the maternal grandparents' request for de facto parent status, found the beneficial exception to adoption did not apply, terminated parental rights, and ordered adoption as the permanent placement plan. The court also found

14

ICWA did not apply.  Both parents filed timely notices of appeal." (*In re C.V.*, *supra*, E074625.)

After Parents appealed, on August 14, 2020, we affirmed the juvenile court's orders denying the section 388 petitions, terminating parental rights, and placing the children for adoption.  (*In re C.V.*, *supra*, E074625.)"

C.     THE THIRD DEPENDENCY CASE

"On October 16, 2019, DPSS filed an out-of-custody petition as to Minor [Re.V.]; she was only one-month old.  DPSS stated that [Re.V.] came under section 300, subdivisions (b)(1) and (j), as a result (1) of the failure or inability of the parents to supervise or protect her adequately; and (2) by the inability of the parents to provide [Re.V.] with regular care due to the parents' mental illness, developmental disability, or substance abuse.

"DPSS alleged that both parents had a history with [DPSS] due to substantiated allegations of general neglect and exposing C. and R. to acts of domestic violence.  DPSS also alleged that Father failed to reunify with his children, continues to deny perpetrating acts of domestic violence against Mother, and has not completed his court-ordered case plan.  DPSS alleged that [Re.V.] will be subject to similar harm as with her siblings.

"The next day, October 17, 2019, the juvenile court ordered [Re.V.] to remain with her parents.

"At the jurisdiction/disposition hearing on November 7, 2019, the juvenile court found all of the allegations true, adjudged [Re.V.] a dependent of the court, and ordered family maintenance services to the parents.  The case plans for the parents included

15

counseling, domestic violence programs, parenting classes, and substance abuse services. Father's case plan consisted of individual counseling, domestic violence programs, parenting classes, substance abuse programs, and drug testing. Both Mother and Father continued to deny domestic violence.

"Mother participated in therapy. Her therapist believed that there is ongoing minimization. In March of 2020, Mother completed a domestic violence program.

"Father attended therapy but did not address his domestic violence issues. He completed a domestic violence program in March of 2020. The parents completed in-home parenting and kept in contact with their parent partners.

On June 19, 2020, the juvenile court continued family maintenance services to both parents.

"The parents continued to live together. Father stated that he and Mother learned not to 'tattle-tell' on each other. Mother stated that they never call the police to report domestic violence. Both Mother and Father continued to participate in general counseling to alleviate issues that led to domestic violence. They completed family therapy in October 2020. They also had negative drug tests.

"On October 13, 2020, a neighbor called the police to report a domestic dispute between Mother and Father. The neighbor reported that a female was banging on the door of the apartment and a male came out. The neighbor then heard the female saying, Oh you were going too hit me. The neighbor heard the female falling and she said Ow. Another neighbor informed the parents that he was calling the cops and the male cursed at the neighbor.

16

"On November 17, 2020, Father denied knowledge about the domestic dispute. Both parents denied any domestic violence.

"On December 21, 2020, the social worker noted concerns during a home visit. Mother appeared sad and emotional. Several times, she stated that Father would not hurt her and that everything was fine. Mother declined an offer for conjoint and individual therapy. The social worker reported that the parents were compliant with [DPSS] and court, but expressed concern for Mother's safety and the family's well being.

"On January 25, 2021, the juvenile court continued family maintenance services to the parents.

"In February of 2021, Mother underwent a medication evaluation. The doctor indicated that Mother appeared altered and minimized her symptoms. Mother appeared unfocused, dazed and unengaged and made bizarre statements. Mother did not know the month or the year, and was talking about having an abortion even though she was not pregnant. The doctor diagnosed Mother with major depressive disorder and other psychoactive substance abuse.

"On February 26, 2021, Father told the social worker that he did not feel Mother's mental health issues were severe and felt that she should be able to care for [Re.V.]. Father left the child alone with Mother for hours when he worked from 5 a.m. to 11 p.m. He did not want strangers to care for [Re.V.] and declined options involving day care. There was no family support available to support Father. Nonetheless, Father felt uncomfortable with anyone other than Mother caring for [Re.V.].

17

"On March 11, 2021, the social worker observed the family home as being very cluttered. As the social worker and Father talked, Mother would interject continuously with bizarre statements. Mother made comments that people are touching and poking at my baby, and denied any domestic violence even when the social worker did not ask about domestic violence. Mother stated that she would rather not get spanked. She also declined child care and medication assistance.

"On March 12, 2021, law enforcement received a report that a female in the parents' apartment was screaming, Get your hands off of me, and that the female was screaming a lot. At 2:36 a.m., the reporting party could hear loud pounding and the male and female were still yelling. At 2:51 a.m. an officer went to the residence and knocked 6 different times, with no answer."

"On March 15, 2021, DPSS filed a section 387 petition. The social worker reported in the detention report that [Re.V.] was placed in a confidential foster care.

"The next day, on March 16, 2021, the juvenile court granted DPSS's request to dismiss the section 387 petition and to file a section 342 petition in its place. DPSS filed a section 342 petition that day. DPSS alleged that [Re.V.] came within section 300, subdivision (b)(1), as a result of the failure or inability of her parents to supervise or protect [Re.V.] adequately, and the inability of the parents to provide [Re.V.] with regular care due to the parents' mental illness, developmental disability, or substance abuse.

"DPSS alleged that the previous disposition had not been effective in the protection of [Re.V.] because Mother's mental health had deteriorated and Father continued to minimize Mother's mental health issues, and continued to allow Mother to care for [Re.V.] unattended for long hours of the day.

"At the detention hearing on March 16, 2021, the juvenile court detained [Re.V.] from both parents. The court ordered twice-weekly supervised visits for the parents.

"In its jurisdictional and disposition report, DPSS requested that the court find the allegations true and deny the parents reunification services under section 361.5, subdivision (b)(10) and (b)(11).

"In the report, the social worker stated that in a psychological evaluation dated March 19, 2021, Dr. Garett reported that Mother suffers from paranoia, extreme emotional instability, and schizophrenia. Dr. Garett stated that in her current condition, she should likely have no contact with any children whatsoever because she is likely to upset them. Dr. Garett recommended that Adult Protective Services visit Mother to ascertain if Father was mistreating her. Mother had reported that Father has threatened to kill her with an ax and that he verbally abuses her, demands sex, and is emotionally abusive as well. Mother also told Dr. Garett that Father had spit on Mother's face and calls her fat. She was afraid of him. Mother cried to at least thirty minutes during the interview and disintegrated to a point at which she could not answer even basic questions. Dr. Garett said that individuals in her condition are frequently in psychiatric facilities. He believed that Mother lives in an abuse environment. Dr. Garett recommended that [Re.V.] not have any visits with Mother.

19

"Father stated that all of the allegations were false. He denied that Mother struggled with her mental health. He was also resistant to DPSS's involvement and was not cooperative. Father accused Mother of being lazy. He had no wish or plan to care for [Re.V.] by himself and was committed to remaining with Mother in a relationship.

"[Re.V.] was in good general health. Prior to her removal, she was observed as reserved with a flat effect, and was not engaging, smiling, or talking. She also was not eating or drinking well. She then started to eat much better, smiled more, played, and slept well.

"DPSS reported that mental health had been an issue in this case since the first dependency for [Re.V.]'s sibling in 2014, and has been an ongoing problem. Domestic violence has also been an ongoing issue for at least seven years.

"DPSS reported that the parents had received numerous services and referrals to assist them with their issues. DPSS provided parenting classes, in-home parenting classes, individual therapy, substance abuse services, psychiatric assessments, medication evaluations, psychological evaluations, marriage therapy, mental health treatment, and domestic violence/anger management programs. Many of these services had been provided to the parents on several occasions. DPSS again provided referrals to the parents. On March 12, 2021, Father stated that he did not want to participate in any more services. He described DPSS's involvement as B.S.

"On March 16, 2021, the parents visited with [Re.V.]. Mother appeared to be out of it and had slow speech. She did not interact with [Re.V.]. Father fed and talked to [Re.V.]. At the end of the visit, Father told Mother to kiss [Re.V.]; she declined.

20

"On March 23, 2021, Father was more affectionate than Mother at the supervised visit.

"On April 1, 2021, Mother's psychiatrist reported that Mother was not open to taking medication and recommended a higher level of care for her. Mother's therapist indicated that the parents have a high-conflict relationship and Mother thought that Father was working against her in services. The therapist stated that Father blames Mother for their current situation. Father did not believe that therapy would be beneficial. The therapist noted that Father was agitated and cursed a lot.

"On April 20, 2021, DPSS secured comprehensive mental health services for Mother. Father stated that Mother was not willing to leave the apartment to attend services. On April 23, 2021, DPSS provided a referral to parents for an agency that provided advocacy, education, support, and public awareness for families affected by mental illness. The social worker also provided the parents with an appointment with the agency. Neither Mother nor Father responded.

"On April 23, 2021, Mother's therapist noted the parents were arguing and that she talked to each of them to calm them down during Mother's zoom therapy session. Father still blames Mother for their current situation. The parents attend supervised visits but neither parent changed [Re.V.]'s diaper.

"On April 29, 2021, the parents attended an intake appointment with a psychiatrist who prescribed Mother antipsychotic medication after Mother stated she was not pregnant. Mother did not go anywhere without Father, and she deferred to him to answer questions.

21

"On May 6, 2021, Father presented as emotional and overwhelmed with Mother's situation. He stated that even with the medication, Mother was not functioning. Mother refuses to visit [Re.V.].

"On May 10, 2021, Father told the social worker that Mother was pregnant. She became very erratic, yelling and carrying on. Father called the police because Mother was trying to leave him. The police came and told him that he could not prevent Mother from leaving. Mother left and Father found her the next day in a parking lot across the street. Mother appeared to be under the influence; she admitted using methamphetamine. Father took her home and she ranted and made bizarre statements. Father called the police and medical personnel came; they took Mother to the hospital. Mother returned home and left again. Father located her at a place where he knew from long ago that they would go get drugs. Father took Mother home, he called the police, and the police arrested Mother for being under the influence. On the same day, the police released Mother and she returned to Father. DPSS provided Mother with services for mental health, substance abuse, and therapy.

"On June 2, 2021, at the contested section 342 jurisdictional hearing, counsel for Mother and Father presented stipulated testimony.

"Mother's stipulated testimony was that she loved [Re.V.] very much and was willing to do anything to reunify with her. Mother's counsel argued that Mother had benefitted from services.

"Father's stipulated testimony was that he had made significant progress on his case plan, had cared for [Re.V.] since birth, and had a close bond with her. Father testified that [Re.V.] always ran up to him to be held by him, and at the end of visits, [Re.V.] did not want to leave him. Father loved [Re.V.] very much.

"Father's counsel asked the court to find not true the allegations in the petition. Counsel did not dispute the juvenile court's orders terminating Father's services and parental rights for [Re.V.]'s siblings. However, counsel argued that Father had subsequently made reasonable efforts to treat the problems that led to the removal of the siblings. Counsel argued that [Re.V.] was removed for a different problem than her siblings. He argued that Father completed programs and benefitted from those services because [Re.V.] was not removed at birth.

"Counsel for DPSS argued that Father was aware that domestic violence and mental health have been longstanding issues in the past and current dependency, and that DPSS had provided services to parents to treat those issues. Counsel argued that Father has failed to benefit from the services. The parents were in the same position as in 2014.

" [Re.V.]'s counsel joined with [DPSS]. She argued that the domestic violence and mental health issues remained.

"The juvenile court took judicial notice of the court's own case file. The court found that the parents have an unhealthy, codependent relationship where both parties lack any insight. The court noted that both parents have severe mental health issues and could not stay away from each other. This led to the cyclical nature of their returns to

23

court. The parents were expecting another child with the underlying conditions unresolved, which suggested that Father did not benefit from services.

"The juvenile court stated that Father's counsel took a narrow view of the underlying issue in this case.

"After looking at all of the allegations found true by the juvenile court in this case, the court found that all of the allegations were interrelated with issues of domestic violence, mental health, and substance abuse. The court stated that Father was in a state of denial when Mother started to decompensate, necessitating DPSS to intervene to protect [Re.V.].

"The juvenile court went on to find that Father remained angry, with high conflict in his interactions. Father was resistant and combative to services. He also continued to fail to protect [Re.V.] from Mother and continued to invite Mother back into his life. The court found "pretty compelling evidence that he [was] still being physically violent with the mother."

"Father faced the same issues as before—his unwillingness to protect [Re.V.] from a very poor relationship Father had with Mother. He failed to earnestly engage in services and he did not learn anything from his past services. The court stated, given the repeated occurrence of the same issues over and over and over again without really any significant break in the occurrence of these behaviors, the spotty involvement of the parents in some services did not rise to the level of making reasonable subsequent efforts to treat the problems that led to the removal.

24

"The juvenile court found true the allegations in the petition, found that [Re.V.] came within section 300, subdivision (b)(1), adjudged [Re.V.] a dependent, and removed physical custody of [Re.V.] from the parents. The court denied reunification services under section 361.5, subdivision (b)(10) and (b)(11), and found that reunification services are not in [Re.V.]'s best interest. The court then set a section 366.26 hearing.

"On June 8, 2021, Father filed a timely notice of intent to file writ petition." On September 23, 2021, we denied Father's writ petition.

In the section 366.26 report, DPSS recommended that the juvenile court terminate parental rights, and Re.V. was placed in a fully-approved adoptive home on June 23, 2021.

Parents continued to live together in a committed relationship. Mother continued to struggle with her mental health and stability, and was arrested in May 2021 for being under the influence of controlled substances. In May of 2021, Mother called law enforcement about a man who threatened her with a knife, called her names, and who took her keys. Father denied he threatened Mother with a knife.

In June, Mother entered a substance abuse program. She left six days later. Father said that Mother left because she was tired and did not want to make her bed; she moved back in with Father. Father stated that he took Mother to a behavioral health facility for an appointment, and he had completed two sessions of Safe Care. He was going to start individual therapy and was waiting to start parenting education.

In August 2021, Mother left a rambling voicemail with the social worker that she would be willing to do services and go to a new mental health clinic.

In its preliminary adoption assessment report filed on September 21, 2021, DPSS recommended that the court terminate parental rights.

At the October 20, 2021, section 366.26 hearing, Parents were present with their counsel. The juvenile court took judicial notice of the entire case file.

The court first denied Father's oral section 388 motion for failing to establish any change in circumstances. Thereafter, the court found that terminating parental rights would not be detrimental to Minor in that none of the exceptions contained in section 366.26, subdivision (c)(1)(A) and (B) applied to this case. The court found adoption to be in the best interest of Re.V. and terminated parental rights.

On October 20, 2021, Father filed a notice of appeal. Mother did not file an appeal. This case is currently pending in our court.

### D.   THE CURRENT CASE INVOLVING MINOR

On September 24, 2021, DPSS filed a section 300 petition for five-day-old Minor due to allegations of substance abuse, mental health, and domestic violence.

In September 2021, DPSS received a referral that Mother gave birth to a baby who had been admitted to the NICU for "cardiac observation, was receiving oxygen, and the echo was abnormal." Mother reported that she planned to seek mental health treatment and had relapsed. Mother and Minor tested negative for all substances at birth.

Mother did not receive prenatal treatment because she was not aware that she was pregnant until six months into her pregnancy. Mother stated that she did not have

26

provisions and was not prepared for the baby but Father was going to get them. Mother's support system consisted of Father and the paternal grandmother with whom Parents lived. The hospital social worker was concerned about Mother's ongoing ability to provide adequate care and supervision of Minor.

Mother told the social worker for DPSS that Mother was not employed and had not been employed for a couple of years. Mother said that she recently relapsed on methamphetamine use but was unable to say when she last used. Father reported that it was "about four months ago." Mother's saliva drug test was negative for substances. She reported that she found out she was expecting when she relapsed and went into the hospital at six months gestation. Mother went to drug treatment after her relapse but left because the program made Mother do chores and clean while she was pregnant.

Father was unable to provide insight or details as to DPSS's involvement or concerns that led to their three older children's removal from their care. Father described Mother's mental health as "undiagnosed." Parents did not know why Mother was prescribed medication in the past. Mother denied she had been receiving mental health treatment.

The paternal grandmother stated that she did not know how much support she could provide because she worked part time. She could not be with Mother at all times that Father worked. The grandmother also stated that she did not want Parents living in her home.

27

Father denied any current substance abuse and denied a history of domestic violence in previous relationships or in his current relationship with Mother. Father was unable to explain why Mother failed to continue receiving mental health treatment. Father had planned to take Minor home and possibly get her into daycare. Father stated he had provisions for Minor at home. He would not leave Mother.

The social worker observed Mother to be "unengaged, unfocused, and disoriented." Mother was unable to recall details about her mental health, domestic violence, substance abuse, and older children not in her care. When asked questions, Mother looked to Father to provide details or answers.

The social worker observed Minor in the NICU. Minor was receiving oxygen and had an appointment due to a possible heart murmur. Otherwise, Minor was eating and sleeping well. Hospital staff reported that Mother did not seem bonded to Minor, did not want to hold her, and did not appear concerned about her. Father held Minor for a "few minutes."

On September 21, 2021, the NICU social worker called DPSS to report additional concerns about Parents' ability to care for Minor at their home. The next day, DPSS placed Minor into productive custody.

Father did not understand why Minor was detained. He reported that he took Mother to a psychiatrist and that Mother was taking medication. He also applied for subsidized childcare.

DPSS explained to Father that they needed time to ensure that Mother was on the appropriate medication and remained compliant with taking her medication. Moreover,

28

Father was informed that Parents minimized Mother's mental health concerns. Father accused DPSS of making up lies. He stated that he could not make Mother "go or stay in treatment."

Minor was taken off oxygen and was ready to be discharged on September 23, 2021. The hospital continued to monitor Minor's oxygen levels. Hospital staff reported continued concerns with Mother's demeanor and apparent mental health; Mother did not seem engaged or concerned with Minor. Father appeared present and loving. Father, however, indicated that he was unable to properly care for Minor at home given his work schedule and lack of arrangements for appropriate supervision.

On September 23, 2021, the hospital staff reported that Minor was eating well, gaining weight, voiding and stooling adequately, and was ready to be discharged.

On September 27, 2021, at the detention hearing, the juvenile court detained Minor. The court ordered Parents to receive twice weekly supervised visitation. Minor was placed in foster care.

In the jurisdiction/disposition report, DPSS recommended that the court find the allegations in the petition true and deny family reunification services to Parents under section 361.5, subdivisions (b)(10), and (b)(11).

DPSS confirmed that Mother went to a mental health clinic on September 22, 2021, and was prescribed "Abilify," for her diagnosis of "Other specified Schizophrenia." Prior to this visit, Mother did not have regular attendance at the clinic and had declined medication. The social worker did not know if Mother was taking her medication.

Minor's cardiologist did not detect a heart murmur. Minor appeared to be meeting the developmental milestones of a newborn. The paternal grandmother did not wish to be considered for placement. The maternal grandparents, who have custody of two of Parents' older children, also did not want placement of Minor. They felt that they were "continuing to enable the parents to continue to have children and felt [Parents] were not learning [a] lesson."

DPSS stated that placement with Parents was not an option. Mother continued to have serious and unresolved mental health issues and Father continued to minimize or deny Mother's mental health issues. Moreover, Parents had ongoing domestic violence issues, and Mother had not been treated for her substance abuse issues. Parents stated that they were committed to remaining together.

On September 28, 2021, Parents visited Minor. Parents held Minor for an hour and changed her diaper.

On October 4, 2021, Father told DPSS that he would only visit Minor on October 12 and 26, 2021, the same days he visited Minor's sibling, Re.V. When DPSS offered Father more visits for Minor, he stated that he did not have availability to visit with Minor as often as he would like. He stated that Mother recently started working at Burger King and was doing well. Mother confirmed that she wanted to visit Minor twice a month and reported having a job.

Since the detention hearing, DPSS provided referrals to services to include individual therapy and parenting for Father; and individual therapy, parenting and substance abuse for Mother. DPSS recommended non-reunification because Parents

30

continued to struggle with the same issues as they have had over the past three dependencies.

On October 26, 2021, Parents visited with both Minor and Re.V. Mother sat with Minor, fed her, and changed her diaper. Shortly thereafter, Minor fell asleep in Mother's arms. Father played with Re.V. Parents left early because Mother had a dental appointment.

Parents visited with Minor on November 9, 2021. They took turns holding Minor and cuddling her. Father changed Minor's diaper and then bottled-fed her. Minor continued to sleep while Mother looked at her and Father tickled her cheeks.

On November 16, 2021, Parents visited Minor. Mother was quiet and seemed unsure. She did not hold Minor securely in her arms. Father fed Minor and changed her diaper. Minor fell asleep.

At the November 23, 2021 visit, Mother was sick and was asked to leave the visitation room. Father checked on Mother. When he opened their car door, smoke came out of Parents' vehicle where Mother was. Father drove the car to a new location and returned.

On November 1, 2021, Mother told the social worker that she was threatened by a lady and her daughter in her apartment complex. Mother said she heard complaints all the time, there was noise in her apartment and neighbors called the police on Mother "all the time."

31

A check with law enforcement indicated that a call for service occurred on October 30, 2021, and that someone contacted the police to report that Mother was "being loud, banging things around the apartment, and that other neighbors [were] complaining. It was noted that the female 'then goes outside and starts yelling at people that are complaining about her.' "

On November 11, 2021, law enforcement conducted a welfare check on Mother. Mother stated that she was scared, being threatened, and could not go home. She told police that she was alone and needed to go to work. She declined transportation to a mental health clinic. Officers contacted Father, who was at work; Father stated that he would call and check on Mother. Both parents were offered mental health services; both declined. Father did not know what caused Mother's behavior that morning but stated it could possibly be drug use.

On November 18, 2021, there was another call for service regarding a disturbance at Mother's apartment complex. A neighbor reported that Mother was at the tennis courts and had "been screaming and flashing herself" for 20 minutes. An officer escorted Mother to her apartment.

On December 2, 2021, DPSS submitted a first amended section 300 petition. The juvenile court continued the contested jurisdictional hearing to December 6, 2021.

At the contested hearing on December 6, 2021, DPSS submitted on its reports and recommendations. Mother's counsel presented stipulated testimony. Mother's stipulated testimony stated that Mother loved Minor very much and wished to receive reunification services. If services were offered to her, Mother would take advantage of them.

Mother's counsel argued that Mother was under the care of a psychiatrist, was taking medication, and made some progress in services to stabilize her life.

Father's counsel also presented stipulated testimony. Father's stipulated testimony stated that he was not minimizing Mother's mental health issues and that he had tried to get her help. There had been no domestic violence between Parents for a very long time, since he completed his domestic violence program. Father stated that he had benefitted from services, including counseling, parenting, domestic violence, substance abuse programs, and drug testing. All of his drug tests have been clean. He was enrolled in counseling and benefitted from the sessions. His visits with Minor were excellent and he loved Minor. Father's counsel argued that Father had made reasonable efforts to address the issues that led to the previous termination of his services and of his parental rights. Father was helping Mother back into services.

Minor's counsel argued that Parents were in the same situation that they were in for Re.V.'s case, just six months prior. Mother's mental health was the same or worse. There was no evidence that Mother was taking medications, other than her own statements. Father chose to stay with Mother, even though he knew that he would not be able to reunify with Minor because Mother was living with him. Minor's counsel asked the juvenile court to deny services to Parents.

Counsel for DPSS joined with Minor's counsel. Counsel argued that Father had not made efforts to remove himself from the situation nor created an environment that would be safe for Minor. Counsel requested that the court deny reunification services to

33

Parents. There was no documentation provided that showed that Mother was back in counseling or receiving mental health services.

The juvenile court took judicial notice of the contents of its own case file. The court noted that it struggled as to how Parents are in a materially different position than they were when the court ruled on Minor's sibling's matter on October 20, 2021. Father was on notice regarding Mother's extreme mental health issues, but he decided to stay in a relationship with Mother and have another child. The court found that Father failed to grasp the seriousness of Mother's mental health situation, and that situation was not improving. Father had not demonstrated that he had learned anything or that he was doing anything "better" now.

Moreover, the juvenile court found that Father's visits did not establish that providing services to him would be in Minor's best interest. Parents' situation was a "revolving door with the same issue occurring over and over again." The court stated that the circumstances that led to Minor's sibling's removal were identical to the present one. Mother's problem was her mental health and Father's problem was his failure to assist Mother in addressing her mental health issues, failing to take the mental health issues seriously in terms of protecting and caring for the children, and continuing to perpetuate the unhealthy dynamic. The court found that reunification services were not in the best interest of Minor.

The juvenile court found the allegations true, as set forth in the petition and modified by the court. Minor was adjudged a dependent of the court. The court denied family reunification services to Parents under section 361.5, subdivisions (b)(10), and

(b)(11). The court set a section 366.26 hearing and reduced Parents' visitation to one time a month.

On December 10, 2021, Father filed a notice of intent to file writ petition.

**DISCUSSION**

A.     SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S ORDER DENYING SERVICES TO FATHER UNDER SECTION 361.5, SUBDIVISION (B)(10) AND (B)(11)

Father argues that "insufficient evidence existed to deny family reunification services to [Father] under 361.5 (B)(10) & (11)." For the reasons set forth *post*, we find that substantial evidence supports the juvenile court's denial of reunification services.

Generally, the juvenile courts are required to provide reunification services to a child and the child's parents when a child is removed from parental custody under the dependency laws. (§ 361.5, subd. (a).) The purpose of providing reunification services is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) Moreover, it is the legislative intent, "that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) "Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. [Citation.] Specifically, section

35

361.5, subdivision (b), exempts from reunification services 'those parents who are unlikely to benefit' from such services or for whom reunification efforts are likely to be 'fruitless.' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120.)

Specifically, section 361.5, subdivision (b)(10), provides that courts may deny services if there is clear and convincing evidence:  "That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent . . . failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent . . . and that, according to the findings of the court, this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent."

Additionally, subdivision (b)(11) of section 361.5, provides that a court may deny services if there is clear and convincing evidence:  "That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

When the juvenile court determines that reunification efforts should not be provided, it " ' "fast-tracks" ' " the dependent minor to permanency planning so that permanent out-of-home placement can be arranged.  (*Jennifer S. v. Superior Court*, *supra*, 15 Cal.App.5th at p. 1121.)  The statutory sections authorizing denial of reunification services are commonly referred to as " 'bypass' " provisions.  (*Ibid*.)

Once the court concludes that one of the situations enumerated in section 361.5, subdivision (b), applies, " ' " the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." ' " (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*); accord, *In re A.G.* (2012) 207 Cal.App.4th 276, 281.) Thus, if the juvenile court finds a provision of section 361.5, subdivision (b), applies, the court "shall not order reunification for [the] parent. . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) "The burden is on the parent to . . . show that reunification would serve the best interests of the child." (*William B.*, at p. 1227; accord, *A.G.*, at p. 281.)

"We affirm an order denying reunification services if the order is supported by substantial evidence." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839 (*Harmony B.*); see also *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 971.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) We do not "resolve conflicts in the evidence, pass on the credibility of the witnesses, or determine where the preponderance of the evidence lies. [We merely determine whether] there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*In re Walter E.* (1992) 13 Cal.App.4th 125, 139-140.)

In this case, Father contends that the juvenile court erred in not concluding that Father had made "reasonable efforts" to treat the problems that led to the removal of Minor. We disagree. While every effort should be made to save a parent's relationship with a child despite the parent's history of substantial misconduct (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 (*Renee J.*)), the "no-reasonable effort" clause was not intended to provide a parent such as Father another opportunity to address an underlying problem when he had numerous opportunities and failed to do so. (*Harmony B.*, *supra*, 125 Cal.App.4th at p. 843.) Instead, it was intended to mitigate an otherwise harsh result in the case of a parent who, having failed to reunify, subsequently worked toward correcting the underlying problem. (*Id.* at p. 842.)

*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908 (*R.T.*) is instructive. In *R.T.*, the child was removed from his parents' care after his father was arrested for domestic violence and the mother admitted drug and alcohol use. The parents had previously failed to reunify with the child's sibling, P.T., who was removed based on the parents' substance abuse and chronic homelessness. (*Id.* at p. 911.) In P.T.'s case, the parents had made only minimal efforts to engage in reunification services. However, two months after the child's removal, the mother made moved to a safe residence, separated from the father, was following mental health recommendations, and had started attending a drug treatment program and 12-Step meetings. Notwithstanding these efforts made by the mother, the juvenile court ordered bypass of reunification services, citing the termination of parental rights in P.T.'s case and finding the parents had not made reasonable efforts to treat the underlying problems. (*Id.* at pp. 911-913.)

38

The Court of Appeal stated: "We do not read the 'reasonable effort' language in the bypass provisions to mean that any effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly appropriate for the juvenile court to consider the duration, extent and context of the parent's efforts, as well as any other factors relating to the quality and quantity of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the focus of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the reasonableness of the effort made. [¶] Simply stated, although success alone is not the sole measure of reasonableness, the measure of success achieved is properly considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable." (*R.T.*, *supra*, 202 Cal.App.4th at pp. 914-915, italics omitted.)

In concluding that substantial evidence supported the juvenile court's finding, the *R.T.* court observed: "There is no evidence that mother made any effort to address her substance abuse issues after minor was returned to her, until minor was once again removed and bypass was recommended. By then, mother had been using drugs again for nearly a year, if not longer, and minor was once again languishing without proper care as a result. There is no evidence in the record that mother, in the month or two of services following minor's second removal, had engaged in these services in any meaningful way. [Citation.] In any event, the juvenile court properly could conclude this recent effort,

39

even assuming the effort were substantiated, was simply too little, too late." (*R.T.*, *supra*, 202 Cal.App.4th at p. 915, italics omitted.)

In this case, Father's efforts did not even come close to the efforts made by the mother in *R.T.* As will be discussed in detail *post*, we find that substantial evidence supports the juvenile court's findings that Father did not make reasonable efforts to treat the problems that lead to Minor's siblings' removal from his custody. (See *R.T.*, *supra*, 202 Cal.App.4th 908.)

As noted in our opinion in case No. E077193, "the issue of whether Father's participation constituted 'reasonable effort' within the meaning of section 361.5, subdivision (b)(10) and (b)(11), remained highly questionable with the inception of the third dependency in October of 2019, when the juvenile court terminated family reunification services in the second dependency just four months prior. Moreover, Father's parental rights were not even terminated in the second dependency until January 2020—after the filing of this case. It is evident from the record that Father's effort, when considering the duration, extent, and context in the long term, was not reasonable. Father failed to treat the problems, namely Parents' domestic violence issues, that led to the removal of [Re.V.]'s siblings. Parents' issue with domestic violence resurfaced time and time again throughout the pendency of the three dependency cases.

"Although Father participated in a domestic violence perpetrators program in the prior dependency, he did not make any progress. Father continued to deny any aggression or domestic violence, even though domestic violence continued to be a major issue.

"On February 15, 2019, when Mother was pregnant, Father punched her in the stomach, slapped her, and threw her to the ground several times. Mother was transported to the hospital because she had stomach pain and redness near her eyes. Then 12 days later, Mother reported to law enforcement that Father hit her with a broom and he was 'coming after her' again. On Mach 20, 2019, Father threatened to beat Mother.

"Also in March 2019, during a supervised visit with [Re.V.]'s siblings, Father 'used profanity, raised his voice and was visibly angry in the presence of his children.' R.'s legs bruised when Father held him too tight. Moreover, [Re.V.] immediately threw up when Father gave her to the caretakers.

"On the day of a supervised visit on May 9, 2019, Father 'yanked' the ignition out of the car, which left the car inoperable in the middle of the street. He also called Mother 'vulgar names, cussed at her and was confrontational.' The juvenile court terminated Father's services and his parental rights soon thereafter.

"Since the prior dependency, Father has failed to show that he made reasonable efforts to address the prevailing domestic violence and mental health issues. As noted in detail above, during the pendency of this case, Father has threatened to kill Mother and continues to verbally and emotionally abuse Mother. Mother's therapist reported that Parents have a high-conflict relationship. Dr. Garett also noted that Father was often agitated. Moreover, Father did not believe therapy would be beneficial. Furthermore, Father continues to deny that he harmed Mother and that Mother has mental health issues.

41

"At the hearing on June 2, 2021, the juvenile court noted that Father 'did not do much during the case of [C.] and [R.] except apparently engage in more domestic violence. The Court terminated his services along with the mother's. [¶] For a period of time after [Re.V.] was born, that was a period of about—services were terminated on [C.] and [R.] on about 6-27, and on 10-16 a new petition was filed involving [Re.V.]. So [C.] and [R.] terminated services 6-27, new petition filed 10-16 as to [Re.V.].'

"The court went on to say that 'the parents did participate in components of their case plan and seemed to be doing better. But, again, considering the involvement of [DPSS] with this family from 4-11-2014 until today's date, a period of more than seven years with a gap in between, but not much of a gap, frankly, in the end, except for the last few weeks, dad has been combative and uncooperative with [DPSS]. [¶] When [DPSS] tried to point out to [F]ather—if you kind of look at what led up to the removal of [Re.V.], it didn't happen, like, all of a sudden. [DPSS] noticed that the there were issues going on with mother. They made suggestions.'

"The court then stated, 'And so, yeah, you jumped through a few hoops in what it looks like to the court, but really failed to learn anything or benefit or, in the Court's view, earnestly engage in those services. Because had you done so when [DPSS] pointed out to you the handwriting that was on the wall, which is the woman that you're married to who's been sick from an emotional standpoint since at least 2014, that she's not well again, and that you need to take protective measures, and instead the report to the social worker is words to the effect, she's not doing her part around the house, just really zero suggestion that you learned anything over the last number of years.'

42

"The court then concluded that the parents were failing either to participate or when they did participate, 'to derive any meaningful value from the services that [the parents] have received.  [¶]  So beyond mere compliance, I cannot find that the parents have subsequently made a reasonable effort to treat the problems that led to the removal of the siblings.  [¶] . . . [¶]  But given the repeated occurrence of the same issues over and over and over again without really any significant break in the occurrence of these behaviors, the spotty involvement of the parents in some services, in the Court's view, does not rise to the level of making reasonable—subsequent reasonable efforts to treat the problems that led to the removal as that language is set forth in (10) and (11).  [¶]  So for that reason I am terminating—or I am denying services to both parents in this matter.' " (*R. V. v. Superior Court* (Sept. 23, 2021, E077193) [nonpub. opn.], pp. 33-36.)

Since Re.V.'s case, Father has failed to show that he has made reasonable efforts to address the prevailing domestic violence and mental health issues or demonstrate that he has learned anything.  In September 2021, Father was  unable to provide insight or details as to why DPSS got involved, or concerns that led to his three other children being removed from his care.  Father continued to deny any domestic violence with Mother, was unable to explain why Mother had not continued receiving mental health treatment, and maintained that he would not leave Mother.

At the contested hearing on this case, the juvenile court noted that "we're dealing with subsequent reasonable efforts, which I view in many ways akin to changed circumstances.  And then we're dealing with a best-interest standard for the child as well.  [¶]  And so I just really don't see how there's any material difference between the

parents' situation where we were with [Re.V.'s] .26 and 388 motion, less than two months ago, and where we are today." The court then went on to state that "so it's sort of a challenging position that we're in, but collectively father and mother, with father as an active and equal participant, have chosen to make—you know, after father was certainly on notice of mother's extreme mental health issues, continued to  make more babies, and father continues to remain in this relationship.  [¶]  It would be one thing if father said, well, my wife is not fit to be a mother because of her mental health issues.  I recognize that, but she needs somebody to care for her, and I love her, and so I'm going to care for her.  And I think everyone would be sympathetic to you taking that position.  Effectively, that's the position that I view you are taking right now, and so you have chosen to stay by her side throughout the matter.  [¶]  You know, it's not an unreasonable position.  But what is unreasonable is to continue to go through this cycle of bringing children into the world in a home environment where the mother is unfit to care for the children, and you are basically not really grasping the seriousness of her mental health situation as was evidenced by [Re.V.'s] case.  I, frankly, heard nothing to indicate that you have had a handle on her mental health situation."

Thereafter, at the conclusion of the hearing in this case, the juvenile court stated: "Reunification services are denied as reunification services are not in the best interest of [Minor].  [¶]  The father . . . is also described in Welfare and Institutions Code Section 361.5 (b)(10) and (b)(11)."  The court went on to state:  "Just as to the (b)(10) and (b)(11), the Court obviously understands that the main issue here for dad and for mom is that, according to the findings of the Court, the parents or guardians have not made—

44

have not subsequently made a reasonable effort to treat the problems that led to the removal of the sibling or half-sibling of that child from that parent or guardian. [¶] And it's hard to imagine a situation where the fact patterns could be more identical to what has happened with previous siblings, and we're, as indicated, really just dealing—we're still in the wake of the hearing that we previously held as to [Re.V.]." [¶] The Court really views the circumstances unchanged, and I see no evidence that the parents have made subsequent reasonable efforts to address these problems, and I've articulated the problems previously for both mother and father. [¶] . . . [¶] Father's problem relates to failing to assist the mother in addressing her mental health issues, failing to take seriously the mental health issues as it pertains to protecting and caring for the children and allowing her to care for the children, and basically continuing to perpetuate this unhealthy dynamic where the Court could not see it fit or appropriate to return a child to the home of the parents. [¶] Certainly progress has not been made, as far as the Court is concerned, from when we were last here addressing the issues related to the sibling [Re.V.]."

We agree with the juvenile court and find that substantial evidence supports the court's findings. Notwithstanding the above, ~~the court's finding~~, Father argues that he has made reasonable efforts. He contends that he completed his prior case plan services and Mother had completed several court-ordered services specifically directed at domestic violence. In support of his argument, Father relies on *Renee J.*, *supra*, 96 Cal.App.4th 1450 and *In re Albert T.* (2006) 144 Cal.App.4th 207. Neither case is helpful to Father.

In *Renee J.*, the mother initially tested positive for drugs early in the dependency. Thereafter, the mother continued to drug test and tested negative. Moreover, she participated in services and was doing everything she could to reunify. (*Renee J.*, *supra*, 96 Cal.App.4th at pp. 1456-1458) Despite the mother's efforts, the juvenile court terminated the mother's services because the court felt that it had no choice based on a California Supreme Court ruling that had been pending in their matter. (*Id.* at p. 1458.) The mother filed a writ. The court of appeal reversed and directed the juvenile court to hold a hearing to consider whether additional services should be offered to the mother. (*Id.* at pp. 1466-1467.)

The facts in this case are distinguishable. Here, Father has failed to make any lasting change in his behaviors, and his unhealthy behaviors have continued throughout the dependency proceedings. Although the mother in *Renee J.* embraced change, and worked hard to make changes, Father, in this case, resists change and does not even acknowledge the domestic violence and mental health issues. Instead of putting the needs of Minor first, Father continues to reside with Mother and makes excuses for her on her behalf. Therefore, *Renee J.* is not applicable.

*Albert T.* also is not helpful to Father. In *Albert T.*, a sibling was removed and services were terminated because the mother could not care for the sibling's special needs. (*In re Albert T.*, *supra*, 144 Cal.App.4th at pp. 211-212.) Two years later, the mother entered into a voluntary contract with the agency to address domestic violence. (*Id.* at p. 213.) After completing individual therapy and domestic violence counseling, the child was removed after a domestic violence incident. (*Id.* at pp. 213-214.) The court

46

of appeal reversed the denial of services because the first dependency involving the sibling did not involve issues of domestic violence. (*Id.* at pp. 219-221.)

The facts in this case are distinguishable. Here, Minor was removed due to the same problems that resulted in her siblings' removal: Mother's problem with her mental health and Father's failure to assist Mother in addressing her mental health issues, failing to take the mental health issues seriously so as to protect and care for Minor, and continuing to perpetuate this unhealthy dynamic. Father received services for these issues in each dependency. The juvenile court in this case found Parents' situation is a "revolving door with the same issue occurring over and over again." Therefore, *Albert T.* is not applicable to the facts of this case.

The purpose of the reasonable effort prong of section 361.5, subdivision (b)(10), and (b)(11), is not to create further delay for a child by allowing a parent, who up to that point has not reasonably addressed his or her problems, another opportunity to do so. (*Harmony B.*, *supra*, 125 Cal.App.4th at p. 843.) Viewing Father's history in its totality, we conclude there is substantial evidence to support the juvenile court's finding that Father did not make a reasonable effort to treat the problems that led to the removal of Minor's siblings from his care. Accordingly, the juvenile court did not err when it denied reunification services under section 361.5, subdivision (b)(10), and (b)(11).

B.      SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S

FINDING THAT REUNIFICATION SERVICES WERE NOT IN

MINOR'S BEST INTEREST

Father contends that "the best interest of the child dictate granting Father family reunification services."  We disagree.

When a reunification bypass provision applies, "[t]he court shall not order reunification for a parent . . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child."  (§ 361.5, subd. (c)(2).)  "A court called upon to determine whether reunification would be in the child's best interest may consider a parent's current efforts and fitness as well as the parent's history.  [Citation.] Additional factors for the juvenile court to consider when determining whether a child's best interest will be served by pursuing reunification include:  the gravity of the problem that led to the dependency; the strength of the relative bonds between the child and both the parent and caretakers; and the child's need for stability and continuity, which is of paramount concern."  (*In re S.B.* (2013) 222 Cal.App.4th 612, 622-623, citing *In re Ethan N.* (2004) 122 Cal.App.4th 55, 66-68.)

"A juvenile court has broad discretion when determining whether. . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.]  An appellate court will reverse that determination only if the juvenile court abuses its discretion."  (*William B.*, *supra*, 163 Cal.App.4th at p. 1229.)  In other words, we will not disturb such a discretionary decision unless the lower court made "an

48

arbitrary, capricious, or patently absurd determination." (*Adoption of D.S.C.* (1979) 93 Cal.App.3rd 14, 24-25.)

In this case, Father asserts that reunification services should be provided because he continued to participate in counseling and his visits with Minor were excellent. These facts are inadequate to overturn the court's finding that providing reunification services to Father would not be in Minor's best interest.

*In re S.B.*, *supra*, 222 Cal.App.4th 612 is instructive. There, the father made a similar argument as Father in this case. The father in *In re S.B.* cited efforts he had made to improve his parenting ability, evidence of his relationship with the child, and evidence of the child's desire to maintain a relationship with the father. (*Id.* at p. 623.) This court found that the determination that reunification would be in the child's best interest is not simply a matter of whether a parent engages in parenting classes and counseling, or whether the child wants to live with the father. (*Ibid.*) Under the circumstances—where the father lacked insight into the factors contributing to his issues—we found that it was reasonable that the court denied reunification services. (*Id.* at p. 624.)

Here, Father also lacks insight into the factors that contributed to his extensive history in the dependency proceedings—domestic violence, mental health issues, and the failure to protect Minor from Mother. Father also never acknowledged that he committed domestic violence with Mother. With his failure to acknowledge domestic violence, it is unlikely that any domestic violence program or individual counseling could be effective—especially after he had been afforded those services in the prior dependency proceedings. "[T]here must be some 'reasonable basis to conclude' that reunification is

49

possible before services are offered to a parent who need not be provided them," and "at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success." (*William B.*, *supra*, 163 Cal.App.4th at pp. 1228-1229.)

Father's history of failing to adequately address his issues in the prior dependencies and his continued attitude toward the proceedings are among the factors indicating that reunification services are unlikely to be successful. These facts show that it is not in Minor's best interest to provide services to Father.

During the contested hearing, the court discussed some "extreme events" that occurred with Mother in November of 2021, then stated: "So this last child is, in the Court's view, in an identical situation to the child [Re.V.]. I don't see that anything would suggest that you have benefited or made subsequent remedial efforts from my orders terminating your parental rights as to the child [Re.V.], and frankly as to the siblings. [¶] The history of [Re.V.]'s case I think is what is most critical here, which is that [DPSS] came to you, and we had allowed [Re.V.] to remain in your care, mom and dad, for a period of time, and it became obvious that mother was in an extreme situation from a mental health standpoint. [DPSS] sought to intervene, tried to coach you and convince you of how dangerous the situation was. You indicated basically that you had a job. You had to go to work. She really was okay, and I think that the record is extremely thorough on addressing that issue, which remains unchanged to today's date."

Thereafter, after summarizing the record in the dependency cases and the record in the current case, the court concluded as follows:

"Again, as harsh as it sounds, I see no resolution to the current situation in terms of making meaningful progress as long as father and mother continue in this unresolved relationship dynamic where mom has an extreme mental health issue and we have a new baby born into this unresolved mental health issue situation. [¶] And father really has not demonstrated that he can be protective. He had the opportunity to do so just a short time ago with [Re.V.]. He did not do so. And there's nothing to indicate that he learned anything and he's going to do better now. [¶] The fact that he does well in his visits is laudable, but it certainly doesn't rise to a best-interest standard because dad is good at taking care of mom. If we look at things that are typically—taking care of the baby during these brief visits is what I should say. [¶] If we look at how best interest is typically analyzed, one of the common underlying analysis of best interest is in a 388 setting, I know it's not identical here, but it's compelling, you know, the pervasiveness and unresolvability of the situation, so, you know, the likelihood that the underlying situation would continue to recur. [¶] And so this situation it's just a revolving door with the same issue occurring over and over and over again. And it has to do with the pervasiveness of mother's mental health problem, her inability and unwillingness to take precautionary steps, father's failure to recognize how serious her mental health issue is, as was noted just recently with him not intervening when it came to [Re.V.]."

At the conclusion of the hearing in this case, the juvenile court stated: "I will also indicate that according to (c)(2) under 361.5, it indicates that the Court shall not order reunification services for a parent or guardian described in paragraph (10) or (11) unless the Court finds by clear and convincing evidence that reunification services are in the

51

best interest of the child.  [¶]  So the way that standard works` seems to shift the responsibility of proving up that element, but whether I viewed it putting the burden on either the mother, the father, or [DPSS], I don't find by clear and convincing evidence that reunification services are in the best interest of the child."

Because the Legislature has decided that parents who fall under section 361.5, subdivision (b), are unlikely to benefit from reunification services, the court properly gave priority to this Minor's interest in the timely establishment of a stable, permanent plan rather than family unification.  Therefore, we find that that the court did not err in finding that it was not in Minor's best interest to grant Father reunification services.

## DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.